928 So.2d 681 (2006)
GALEN-MED, INC. d/b/a Lakeland Medical Center, Inc.
v.
Doris Esler PORTER, on her Own Behalf and on Behalf of her Children, Namely Eric Porter, Brandon Porter, Jennifer Porter, Jacilynn Porter, Gina Porter, Jessica Porter, Nicholas Porter, et al.
Doris Esler Porter on Behalf of her Minor Children Namely Eric Porter, Brandon Porter, Jennifer Porter, Jacqueline Porter, Gina Porter, Jessica Porter, et al.
v.
Harold R. York, M.D. and ABC Insuance Company.
Nos. 2005-CA-0788, 2005-CA-0789.
Court of Appeal of Louisiana, Fourth Circuit.
March 29, 2006.
Rehearing Denied April 28, 2006.
*682 Harry T. Widmann, Scott T. Winstead, Harry T. Widmann & Associates, Metairie, Counsel for Doris Porter, et al.
Stephen M. Pizzo, Mary K. Peyton, Blue Williams, L.L.P., Metairie, Counsel for Dr. Harold R. York.
(Court Composed of Judge TERRI F. LOVE, Judge MAX N. TOBIAS, Jr., and Judge EDWIN A. LOMBARD).
MAX N. TOBIAS, JR., Judge.
Doris Esler Porter, on her behalf and on behalf of her minor children, Eric Porter, Brandon Porter, Jennifer Porter, Jacilynn Porter, Gina Porter, Jessica Porter, Nicholas Porter (hereinafter collectively referred to as "plaintiffs" or "Mrs. Porter"), appeals from a judgment in favor of defendants, Harold R. York, M.D. ("Dr. York") and his insurer, dismissing her suit against them with prejudice. After reviewing the record and applicable law, we affirm the judgment.
As reflected in the record, Mrs. Porter became pregnant and first saw her obstetrician/gynecologist, Andrew O. Montz, M.D. ("Dr.Montz"), on 17 June 1997, at approximately 15 weeks gestation. Her medical history reflected that she had five prior pregnancies that went to term; two that were pre-term; and one that ended in a spontaneous abortion. She admitted smoking cigarettes, but denied using alcohol or drugs. As part of the routine prenatal workup, Dr. Montz testified that he tested Mrs. Porter for the presence Group B Beta Streptococcus ("GBS"). The test result was positive and Dr. Montz prescribed oral antibiotics to eradicate the bacteria. Dr. Montz did not retest Mrs. Porter for GBS.
Mrs. Porter was admitted to Columbia Lakeland Memorial Hospital ("Lakeland") on 4 November 1997 at 1:20 p.m. Her membranes had spontaneously ruptured and she was in active labor. A short time later, between 2:45 p.m. and 3:00 p.m., Christopher Porter ("Christopher") was born via vaginal delivery. His gestational age was estimated at between thirty-five and thirty-six weeks, and he was considered to be a pre-term baby. He weighed four pounds, thirteen ounces and his APGAR scores were 9 and 10.
Christopher's pediatrician, Dr. York, was informed that Mrs. Porter had tested positive for GBS during her pregnancy. Therefore, he ordered a latex serum agglutination test to see if Christopher had GBS. The test was negative.
Christopher's hospital records reflect an uneventful stay. On 5 November 1997, the day after he was born, Dr. Montz circumcised Christopher. Later that same day, approximately twenty-two hours after he was born, he and his mother were discharged from the hospital.
Contrary to the medical records, Mrs. Porter testified that when Christopher was born, she told Dr. York that something was wrong with him. She further testified that Christopher never breast fed. Instead, she stated that he only sucked three times on one occasion and then was bottle fed. By 5 November 1997, she stated that his cry was too low, he did not open his eyes, and he did not want to move. She testified that she again told Dr. York and a nurse that something was wrong with Christopher and that she did not want him released from the hospital. Mrs. Porter stated that in response to her concerns, Dr. York told her that he had already discharged Christopher. Mr. Porter confirmed this conversation.
*683 Dr. York testified that he had examined Christopher twice. The first time was on 4 November shortly after he was born. He examined him again at 7:20 a.m. the next day. He was aware that Mrs. Porter had tested positive for GBS five months before she gave birth to Christopher and that she was treated with antibiotics during her pregnancy. He further testified that in 1997, it was the standard of care at several hospitals in the New Orleans area to perform a latex serum agglutination test on an infant to determine if the infant had been exposed to GBS through the presence of antibodies. He thought at the time that the test was extremely sensitive; thus, he felt that a complete blood count ("CBC") and blood culture were unnecessary.
Dr. York admitted, however, that while it was once thought that the latex serum agglutination test was very sensitive, it is now known that the test had a false negative rate as high as seventy-five percent. In deciding how to proceed, he did not rely solely on the negative latex serum agglutination test. It was also significant that (a) Christopher's vital signs were normal the entire time he was in the hospital; (b) at the time of delivery, Mrs. Porter did not have a fever; (c) only a small percentage of individuals exposed to GBS ever become infected; and (d) while Christopher was pre-term, his organs and immune system were fully developed. Therefore, Dr. York stated that Christopher had no greater risk of mortality or morbidity than a full-term newborn.
Dr. York also testified that he did not reach the decision to discharge Christopher on 5 November at 7:20 a.m. but agreed to discharge Christopher around noon that day because of the following: (a) the verbal report he received from Christopher's nurse, which he relied upon because the nurses in the nursery at Lakeland were highly trained neonatal nurses; (b) no problems existed with the circumcision; (c) Mrs. Porter was an experienced mother who had cared for other pre-term infants; and (d) Mrs. Porter had been discharged and wanted to take Christopher home. In addition, he testified that no standard of care existed requiring that a newborn be hospitalized for at least twenty-four hours after birth. Dr. York admitted, however, that his discharge notes were dictated at 7:20 a.m. after he examined Christopher that morning and not later when he was actually discharged.
Mrs. Porter testified that on the ride home from the hospital, she took Christopher out of his car seat and held him so she could hear and see him; she had not done this with her other children. Mrs. Porter further testified that after arriving home, Christopher did not eat and did not have a wet diaper. She claimed to have notified Dr. York's office, but Dr. York denied receiving such a message.
On the night of 5 November 1997, Mrs. Porter placed Christopher in her bed at approximately 10:30 p.m. He was wearing a yellow shirt. Thereafter, Mr. Porter got in bed. He held Christopher for a while and then placed him in the middle of the bed.[1]
Both Mr. and Mrs. Porter testified that at approximately 4:00 a.m. on 6 November, they awoke when their young son Nickie began knocking on their door and screaming that something was wrong with Christopher. He told her that something yellow was covering his face. Mrs. Porter picked *684 up Christopher and he was not breathing. She handed Christopher to Mr. Porter, who began to perform CPR while Mrs. Porter called 911. The EMS records reflect that Christopher was breathless, pulse-less and nonresponsive. At 4:20 a.m., he was pronounced dead at Chalmette Medical Center.
The records from Chalmette Medical Center contain two notations regarding feeding. One states "breast feeding" and the other states that Christopher was put to bed at 10:30 p.m. after feeding. Despite these notes, Mrs. Porter maintained that Christopher did not eat after leaving Lakeland and that the records from Chalmette Medical Center are incorrect.
On 6 November 1997, William P. Newman III, M.D. ("Dr.Newman") a pathologist, performed an autopsy on Christopher. He testified that no gross findings existed to establish the cause of death. However, based upon his microscopic findings, he opined that Christopher died due to respiratory failure secondary to early bronchial pneumonia. Blood cultures may have confirmed whether or not Christopher had an infection and, if so, its identity. However, blood cultures were not done. Dr. Newman further testified that he could not rule out that a heart arrhythmia or suffocation (i.e., due to Mr. or Mrs. Porter rolling over him in bed) caused Christopher's death.
Mrs. Porter, individually and on behalf of her minor children, and Mr. Porter filed a claim against Lakeland, Dr. York, and Dr. Montz with the Division of Administration for a medical review panel.
On 28 March 2001, a medical review panel concluded that the discharge of a small premature infant less than twenty-four hours of age was inconsistent with general pediatric practice. However, it found that all other aspects of care were consistent with the standard of care in November 1997. It found that one could not ascertained from the record whether the early discharge contributed to Christopher's death. Finally, it found that Dr. York had not breached the standard of care by dictating his discharge notes hours before Christopher's discharge from the hospital.
In May 2001, Mrs. Porter, individually and on behalf of her minor children, and Mr. Porter filed suit against Dr. York, his insurer, Lakeland, and its insurer. On 1 June 2004, plaintiffs dismissed Lakeland with prejudice; Dr. York and his insurer remained the only defendants.
At a non-jury trial in September 2004, several witnesses were called to testify. In addition to the parties, Dr. Montz, and Dr. Newman, the other witnesses were Howard Bruce Harris, M.D. ("Dr. Harris"), Nicholas A. Danna III, M.D. ("Dr. Danna"), Randall Douglas Craver, M.D. ("Dr. Craver"), Richard Paul LeBeouf, M.D. ("Dr. LeBeouf"), Victor Lunyong, M.D. ("Dr. Lunyong") and Marcello Gioe, R.N. ("Ms. Gioe").
Dr. Harris was qualified as an expert in pediatrics and neonatology and testified on behalf of the plaintiffs. Dr. Harris opined that Christopher's death was due to sepsis caused by GBS. He based his conclusion on the following: (a) Mrs. Porter had tested positive for GBS during her pregnancy; (b) a repeat culture had not been done and, therefore, it is unknown what colonization was present at the time she delivered Christopher; (c) GBS was the most common infection in babies in 1997; (d) Christopher died when he was approximately thirty-six hours old; (e) the placenta showed evidence of inflammation, which could indicate that Christopher was responding to an infection; and (f) the pathologist, Dr. Newman, reported that Christopher had acute bronchopneumonia. Dr. Harris stated that thirty-five to fifty-five *685 percent of babies with GBS develop pneumonia.
Having concluded that Christopher's death was due to sepsis caused by GBS, Dr. Harris testified that Dr. York breached the standard of care by not observing Christopher in the hospital for forty-eight hours after birth and by not ordering a CBC and blood culture. In support for his opinion, Dr. Harris cited an algorithm published by the American Academy of Pediatrics in 1996, discussing intrapartum antimicrobial prophylaxis for the prevention of early on-set GBS disease. However, as noted by Dr. York, a notation on the algorithm states that the suggestion to order a CBC and blood culture is not an exclusive approach of management.
Dr. Harris testified that had a blood culture been performed, he believed to a "reasonable degree of medical certainty"[2] that it would have been positive. He gave two reasons for this opinion: (a) blood cultures have a low false negative rate of only five to twenty percent; and (b) Christopher was responding to an infection, as evidenced by the autopsy. He was not, however, able to state to a "reasonable degree of medical certainty"[3] that a CBC would have been positive.
Dr. Harris also opined that it was a breach in the standard of care for Dr. York to complete his discharge report hours before actually discharging Christopher. He stated that the report should have been completed contemporaneously with discharge. Because the report was apparently completed hours before discharge, Dr. York would not have known Christopher's actual medical condition at the time he was sent home.
Under cross-examination, Dr. Harris first conceded that it was never confirmed that Christopher had GBS. Second, he admitted that although eighty to eighty-five percent of the individuals with GBS exhibit symptoms within the first twelve hours of birth, nothing specific in Christopher's hospital records support a conclusion that he had an infection. Finally, he admitted that only one to two percent of the individuals exposed to GBS actually become infected.
Dr. Danna testified on behalf of the defense and was qualified as an expert in pediatrics. He was also a member of the medical review panel. Dr. Danna testified that since rendering his opinion, he no longer believed that Dr. York breached the standard of care by discharging Christopher less than twenty-four hours after birth. While admitting he had not received any new information since rendering his opinion, he stated upon further *686 thought, he changed his opinion because he knew of no medical rule requiring a newborn to remain in the hospital for twenty-four hours before being discharged. As to the remainder of his opinion, Dr. Danna still maintained that even if Christopher's discharge was premature, it did not contribute to his death. Further, Dr. Danna testified that he did not believe that Christopher had GBS. He based this conclusion on the following: (a) rarely do mothers with GBS pass the disease on to their children; (b) if the child had GBS, he would have been born sick; and (c) symptoms of the infection would have appeared before the child was discharged. However, in the present case, the hospital records reflect no sign of respiratory difficulties or infection. In fact, the chart notations were inconsistent with exposure to GBS. Specifically, he noted that the chart reflected that Christopher fed well and slept.
Dr. Danna further testified that Dr. York did not breach the standard of care by failing to order a CBC or blood culture since the tests can be misleading. Finally, he stated that he did not believe Christopher's slight prematurity put him at an increased risk for infection.
Dr. Craver was called to testify for the defense and was qualified as an expert in anatomical and pediatric pathology. He could not determine what caused Christopher's death. Dr. Craver stated that he could not rule in or out suffocation or cardiac arrhythmia as a cause of death. While Christopher had bacterial bronchial pneumonia, he opined that not enough pneumonia was present to have caused his death; instead the pneumonia was a contributing factor to his death. Dr. Craver admitted that while GBS is known to cause bronchial pneumonia and septicemia, he saw nothing specific in the medical records to indicate the presence of GBS.
Additionally, Dr. Craver opined that had blood cultures been done, they may not have been positive. He concluded that although Christopher was slightly premature, he was fully developed, and no extenuating circumstances existed to make him less able to handle an infection.
Dr. LeBeouf also testified for the defense. He was qualified as an expert in pediatrics and was also a member of the medical review panel. Dr. LeBeouf testified that in 1997, no standard of care existed requiring that pre-term infants with risk factors for GBS be monitored for forty-eight hours after birth. Furthermore, he testified that since rendering his opinion as a panel member, he, like Dr. Danna, had changed his mind. Specifically, he no longer believed that it was a breach of the standard of care to discharge Christopher less than twenty-four hours after his birth.
In explaining his position, Dr. LeBeouf testified that even when he signed the panel opinion, he did not strongly feel that Dr. York had deviated from the standard of care. Upon further thought, he stated that he no longer believed the standard of care was breached.
Dr. LeBeouf based his current opinion on the fact that Christopher remained in the hospital for twenty-two hours after birth, only two less than twenty-four, was only slightly premature, and had a slight deviation in weight. He noted that Christopher's birth weight was recorded as four pounds, thirteen ounces. It was possible that Christopher's birth weight was five pounds, but he may have voided prior to being weighed.
In keeping with the panel opinion, Dr. LeBeouf testified that that Christopher's discharge twenty-two hours after his birth had no effect on the outcome. He admitted that GBS is one of the most frequent infections in newborns, but that several *687 organisms could have caused an infection. He conceded that the latex serum agglutination test for GBS had both high false positive and negative rates and that a blood culture would have been a more definitive, quicker tests. However, in the present case, based upon Christopher's appearance and the examination results, Dr. LeBeouf was not sure that he would have ordered any tests at all.
Finally, Dr. LeBeouf had no problem with Dr. York completing the discharge findings hours before Christopher was actually discharged. He stated that in his own practice, he would complete the chart prior to the actual discharge by a few hours and, if needed, make an addendum to the notes.
The final physician to testify for the defendant was Dr. Lunyong, who was qualified as an expert in neonatology. Dr. Lunyong admitted that technically, Christopher was a pre-term baby that put him at a slightly greater risk of developing infection than a full term baby. Dr. Lunyong also admitted that Mrs. Porter's placenta showed early signs of inflammation, which could have indicated an infection of some sort, although not necessarily an infection causing GBS. Dr. Lunyong admitted that no other likely explanation existed for a child developing bronchial pneumonia less than forty-eight hours after his birth except the possibility of an infection passed to him by his mother.
Nevertheless, Dr. Lunyong testified that Dr. York did not breach the standard of care. He stated that when a pregnant woman tests positive for GBS months before she delivers, the physician's decision to treat the infant depends on the presence of risk factors. In the present case, no risk factors existed to warrant treatment, blood cultures, or a CBC: (a) Mrs. Porter showed no signs of infection; (b) her labor was short (i.e. less than six hours) which meant a limited exposure time; and (c) Christopher showed no signs of infection. Dr. Lunyong opined that considering the lack of risk factors, had a blood culture been done, it was very unlikely it would have been positive.
Dr. Lunyong also testified that Dr. York did not breach the standard of care by completing the discharge summary hours before Christopher was actually discharged. Although not in the medical records, Dr. York found Christopher to be well and, because the staff found no problems, Christopher's circumcision went forward.
Finally, Dr. Lunyong testified that it was not a breach of the standard of care to allow Christopher to be discharged when he was less than twenty-four hours old. He noted that in 1997, no national protocol existed dictating the amount of time a newborn should spend in the hospital. In addition, no reason existed why Christopher should have remained in the hospital. Specifically, Dr. York had examined Christopher twice in the hospital and he had no signs of an infection. While he was less than twenty-four hours old, he had passed the highest risk period for symptoms of an infection to surface. In fact, Dr. Lunyong testified that with GBS, the majority of newborns acquire symptoms within the first twelve hours after birth.
Finally, Ms. Gioe, one of Christopher's nurses at Lakeland, was called by the defense. She began taking care of Christopher at 7:00 a.m. on 5 November 1997, the day after he was born. She testified that Christopher's vital signs were normal and that no abnormalities were noted. Furthermore, she stated that Mrs. Porter had reported that Christopher was feeding well. She noted that the circumcision was without complications. Finally, she testified that Christopher was fine when he left her care and was discharged from the hospital with his mother at approximately 13:45 hours.
*688 The trial court rendered judgment on 28 October 2005, finding in favor of the defendant. In lengthy written reasons for judgment, the court found that the plaintiffs failed to establish by a preponderance of the evidence that Dr. York had breached the standard of care in his treatment of Christopher. The court did not find Dr. Harris's opinion that the standard of care was breached persuasive. Specifically, the court found that it was not clear what had caused the infant's death and insufficient proof existed to conclude that Christopher had GBS. The trial court rejected Dr. Harris' opinion that had blood cultures been done, they would have been positive.
The trial court also found that it was not a breach of the standard of care to discharge Christopher when he was less than twenty-four hours old, relying on the testimony of Drs. Danna, LeBeouf, and York. Finally, the trial court found that Dr. York did not breach the standard of care by not completing the discharge report contemporaneously with the discharge. The court found credible Dr. York's testimony that he made the decision to discharge Christopher at noon after receiving a report from the nursery nurse.
The plaintiffs have assigned three issues for review:
1. Whether the trial court erroneously relied upon the thoroughly contradictory and inconsistent testimony and opinions of defense experts, especially considering that the two of those experts reached opposite conclusions as members of the medical review panel.
2. Whether the trial court erred as a matter of law by disregarding the uncontroverted expert testimony that when a pediatrician, like Dr. York, suspects a GBS infection, the standard of care calls for a blood culture.
3. Whether, as a matter of law, the trial court applied the wrong legal standard regarding both the standard of care for a pediatrician and causation of Christopher's death.
In Madison v. Ernest N. Morial Convention Center-New Orleans, 00-1929, pp. 18-19 (La.App. 4 Cir. 12/4/02), 834 So.2d 578, 590, this court set forth the burden of proof and standard of appellate review in a medical malpractice action against a physician as follows:
In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Martin v. East Jefferson General Hosp., 582 So.2d 1272, 1276-1277 [(La.2005)]. Resolution of each of these inquires are determinations of fact which should not be reversed on appeal absent manifest error. Id.; Descant v. Administrators of Tulane Educational Fund, 95-2127, p[p]. 8-9 (La.App. 4 Cir. 1/21/98), 706 So.2d 618, 628. If the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Martin, supra. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id.; Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The determination of an expert's credibility is also a factual question subject to the manifestly erroneous/clearly wrong standard of review. Id.; Martin, supra. The rule that questions *689 of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Lasyone v. Kansas City Southern R.R., 00-2628 (La.4/3/01), 786 So.2d 682. The evaluation of and resolution of conflicts in expert testimony are factual issues to be resolved by the trier of fact, and the determinations of the fact finder should not be disturbed on appeal in the absence of manifest error. Id.

The trial court heard testimony from four medical experts who gave their respective opinions regarding the applicable standard of care on the issues presented herein. Only Dr. Harris opined that Dr. York had breached the standard of care by failing to do a CBC and blood culture on Christopher soon after his birth. The court found his testimony unpersuasive and instead relied on the opinion of the other medical experts who disagreed with him. We do not find that this conclusion was manifestly erroneous or clearly wrong given the testimony in the record.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] Mr. Porter admitted that Christopher was not his biological child and that he and Mrs. Porter were divorced. However, he was staying in the home because his children were living there and he slept in Mrs. Porter's bed because no other place existed in the house for him to sleep.
[2] As we stated in Daspit v. Barber, 00-1221, p. 5 (La.App. 4 Cir. 4/11/01), 786 So.2d 962, 967:

Requiring that plaintiffs prove their injuries to a "reasonable medical certainty" holds plaintiffs to an artificially high standard, according to the Louisiana Supreme Court in Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993). The "reasonable medical certainty" standard requires plaintiffs to prove their case beyond a reasonable doubt, and also tends to preclude the trier of the facts from relying on evidence other than that of medical experts. Id. The proper standard is preponderance of the evidence.
In the instant case, we find that the trial court's use of the term "reasonable degree of medical certainty," when discussing Dr. Harris' testimony does not mean that the court applied the wrong standard. In fact, we note that when setting forth the standard in the reasons for judgment, the trial court wrote that the plaintiffs "must establish by a preponderance of the evidence" that Dr. York's treatment fell below the ordinary standard of care. Consequently, we find no error in that regard.
[3] See footnote 2, supra.