PAUL A. BONIN, Judge.
 

 |2In this medical malpractice case, plaintiffs, Todd Beaucoudray and his parents, appeal a jury verdict in favor of the defendants, Dr. John Walsh and Dr. James T. Bennett.
 
 [1]
 
 Finding that there was a reasonable basis for the jury’s findings of fact and determination that the plaintiffs failed to bear their burden of proof on the standard of care required of the defendants in their treatment of Todd Beaucoudray (“Todd”), for the reasons given below, we affirm the trial court judgment dismissing the case with prejudice.
 

 1
 

 TODD BEAUCOUDRAY’S MEDICAL HISTORY
 

 An understanding of Todd Beaucoud-ray’s complex congenital medical and developmental conditions that existed prior to his treatment by Dr. Walsh and Dr. Bennett is helpful in evaluating the claim of medical malpractice made in this case. Todd Beaucoudray was born in 1982 with multiple health problems, including but not limited to, congenital spinal abnormalities. At age eleven, he was of short stature for his age. He received growth hormone therapy. He had previously had |3surgery to correct his club feet. His hearing was partially impaired. Past medical history indicated that he suffered from hernias. He appeared somewhat barrel chested due to rib prominence.
 

 Todd was a good student. He was ambulatory and active, participating in all his activities except contact sports. His upper
 
 *919
 
 extremities were normal and he had no problems with his hands. X-rays of Todd’s spine revealed abnormalities; however, there was no evidence of scoliosis.
 

 Todd and his parents were eager that he lead a full life and sought medical care that would help them realize their hopes for their son. He and his parents sought medical treatment to give him the most mobile life possible, for as much of his life as possible. In 1993, the Beaucoudrays were referred to Dr. Bennett, an orthopae-dist, for his opinion. Records indicate that Todd had already begun showing signs of reduced motor functionality, and his mother expressed that fear to Dr. Bennett. X-rays taken in 1994 showed spinal abnormalities but no evidence of scoliosis or abnormal kyphosis. However, X-rays taken in April 1997, prior to the surgery at issue, showed a marked change in Todd’s spinal alignment, including significant scoliosis and major kyphosis changes.
 
 [2]
 

 Todd’s scoliosis was classified as congenital, i.e., caused by vertebral anomalies present at birth. In the upper thoracic or chest area of the spine, his spine curved sideways, i.e. “left-directed” scoliosis. The curve of his spine from |4front to back was more pronounced than normal, which doctors identified as congenital acute angled thoracic kyphosis. Rather than lying in a gradual curve, his spine arched sharply forward. Particularly in x-rays of the thoracic spine, his vertebrae were not clearly defined.
 

 In his cervical ■ spine, individual vertebrae were almost completely normal. However, his lumbar spine was noted to be very short and his lower ribs were less than an inch from his pelvic bone, reducing space for his internal organs. X-rays of the pelvic area indicated that Todd’s left leg was about one-half inch shorter than his right leg. Further diagnostic studies showed that some vertebrae were triangle-shaped rather than stacked like rectangular blocks. Todd’s lumbar vertebrae lacked pedicles, whose primary function is to act as a bridge to protect the spinal cord and give stability to the vertebrae.
 

 In August of 1997, Todd reported having weakness in his legs which could indicate neurologic symptoms due to spinal cord problems. As Todd grew, his spinal cord was pulled over the “angular kink” of the kyphosis and became irritated. MRI’s showed the spinal cord had normal room in the cervical area, passed through an extremely narrow and tight area in the thoracic area, and then once again had normal room in the lumbar area. One vertebra at the sharpest point of the “kink” was almost one-half normal size. If the kyphosis or “kink” were to be straightened out, a large gap in the bony structure would leave the spinal cord unprotected. Additional studies of his spine showed that with the exception of vertebrae in his neck, Todd did not have one normal vertebra.
 

 |r,Because he had not finished growing at age fifteen, Todd’s condition was expected to worsen. Without surgical intervention, his spinal cord would eventually become compressed, and almost certainly Todd would ultimately become totally paralyzed.
 

 Treatment by Defendants, Dr. Bennett and Dr. Walsh
 

 Dr. Bennett examined Todd in September of 1993 and again in 1994, and noted his congenital spinal deformities. He both offered and recommended regular followup. In 1997, at age fifteen, Todd returned
 
 *920
 
 to Dr. Bennett. He wanted to be evaluated prior to beginning a weight-lifting program, as well as to have his flared ribs corrected. Also, his mother expressed her concern that Todd’s spine might be deteriorating.
 

 During the 1997 examination, Dr. Bennett noted abnormal reflexes, three beats of clonus (muscular contractions which may indicate spinal cord damage), and abnormal x-rays. As a result, Dr. Bennett ordered an MRI to assess any spinal cord impingement. In layman’s terms, the MRI revealed that Todd’s spinal cord was irritated as it was pulled over the “kink”, and significantly flattened out as it made a sharp turn over that “kink”.
 

 Dr. Bennett suggested options to stabilize Todd’s spine, avoid further cord irritation, and avoid development of other neu-rologic problems. He referred the family to Dr. John Walsh, a pediatric neurosurgeon, for a determination of appropriate surgical intervention(s).
 

 | (iAt that time, there were two surgical options: first,
 
 in situ
 
 fusion and second, decompression. An
 
 in situ
 
 fusion fuses the spine in its current position so that the existing curvature does not worsen. A decompression removes bone which is causing compression to the spinal cord. Neither option corrects or straightens the spine. Due to Todd’s unusual physical deformities which could complicate surgery, numerous additional specialists, including a neurosurgeon, a pediatric general surgeon, a pulmonologist, a neurologist, and a neuroradiologist, were consulted and participated in the evaluation of medically appropriate treatment.
 

 Dr. Walsh performed a neurological assessment and found that at that point Todd had normal neurological function, indicative that the cord had sufficient room. This finding essentially excluded decompression as an initial surgical option. Dr. Walsh also confirmed that as Todd’s spinal cord passed over the top of the “kink”, it became markedly thin and displaced to one side. He recommended
 
 in situ
 
 fusion, to be performed with the assistance of a pediatric general surgeon, as a conservative approach.
 
 [3]
 

 A Choice of Procedures
 

 As previously noted, complete work-ups were performed by numerous specialists prior to surgery being authorized. Included in the work-ups were a CT scan, a myelogram, post-myelogram CT scans, and somatosensory evoked 17potentials (“SSEP’s”), which measured Todd’s neuro-logic function at the time.
 
 [4]
 
 Both at a personal consultation, as well as in writing, Dr. Bennett answered Mrs. Beaucoudray’s inquiries and concerns. After she met with the surgical team, and after discussion with Dr. Bennett regarding alternatives to the proposed surgery as well as the risks involved, she executed an informed consent for the
 
 in situ
 
 fusion.
 

 It is undisputed that Todd faced paralysis without surgical intervention. It is undisputed that in order to interrupt or avoid as much as possible the lifelong effects from paralysis, an
 
 in situ
 
 fusion was the appropriate initial medical procedure. It is undisputed that with the evaluation by a team of medical specialists, his functionality just prior to surgery, the appearance of
 
 *921
 
 symptoms which concerned both Todd and his parents, as well as his expected inevitable paralysis, decompression was
 
 not
 
 the appropriate initial medical procedure.
 

 Medical Procedure Peifovmed
 

 Todd was admitted for surgery on October 20, 1997. The
 
 in situ
 
 fusion was completed while a neurologist monitored SSEP’s during surgery. SSEP’s remained normal. X-rays were taken during surgery. And as this was considered a high risk procedure, a “Stagnara wake-up test” was performed.
 

 During a Stagnara wake-up test, the patient is awakened to determine motor function. A neurosurgeon was consulted while Todd was still in the operating room. Physicians’ progress notes on the day of surgery state that Todd “was |sawakened while intubated in the operating room at the end of the procedure and could be prompted to move his upper extremities on command but could not move his legs.” Todd’s feet were examined and the operative report states that the neurosurgeon “felt that his sensory was in part intact, but no lower extremity motor function was present.” SSEP’s still remained normal.
 

 Todd’s parents were informed of the test results, as well as of the doctors’ plan, at the recommendation of the pediatric radiologist, to take Todd from the operating room to perform both regular and CT myelograms to determine whether there was a spinal cord block and, if so, whether a decompression should be immediately performed. Mrs. Beaucoudray signed a separate consent for these tests. The operative report and physicians’ progress notes both indicated that the myelogram showed good flow throughout the spinal cord, around the fusion and the “kink”, indicating
 
 no new
 
 spinal cord compression. Dr. Walsh concluded that immediate decompression was not warranted.
 

 Postoperative Care under Dr. Bennett
 

 After discussion among the physicians, it was decided that the best course of treatment for Todd was to be placed immediately on IV steroids and evaluated on an on-going basis to determine what motor recovery might occur.
 

 The first day after surgery Todd appeared to have some return of sensation to light touch in both lower extremities, as well as limited movement of his toes. The second day after surgery Todd appeared to have some sensation in his right mid thigh and left mid calf. IV steroids and IV antibiotics were continued.
 

 | gTodd was released from the hospital, attended inpatient rehabilitation therapy at another facility, then was released home to his parents with additional therapy and follow up care. In the weeks that followed, Todd reported some improvement, particularly in his right leg but, regrettably, little in his left leg.
 

 The Beaucoudrays’ Change of Doctor
 

 In January 1998, Todd discontinued his post-surgery therapy and began seeing Dr. Andrew King at Children’s Hospital in New Orleans.
 
 [5]
 

 On February 17, 1998, Dr. King began a decompression procedure, which was only partially performed due to massive blood loss.
 
 [6]
 
 Following the limited decompression, Todd began and completed inpatient
 
 *922
 
 therapy. He was ultimately discharged from Children’s Hospital in April of 1998.
 

 By July 1998, Todd noticed some increased sensation in his left thigh and the ability to move his left big toe on command. The right side continued to show some improvement, consistent with Todd’s history prior to Dr. King’s decompression surgery.
 

 2
 

 STATEMENT OF THE CASE AND LAW
 

 The factual issue for the jury to decide was the applicable standard of care for the defendant doctors, given Todd’s medical condition and the state of medical knowledge at the time of his surgery. All treating physicians and experts who [1ntestified at trial agreed that the
 
 in situ
 
 fusion was the proper surgical option, and there is no dispute that the surgery was properly performed. The decisions made after surgery ultimately became the subject of the medical malpractice action. Todd’s parents ultimately chose to prosecute against Dr. John Walsh and Dr. James T. Bennett. The question that was posed at trial to Todd’s health care providers was this: after the
 
 in situ
 
 fusion was performed, and the Stagnara wakeup test showed no lower extremity motor function despite normal SSEP’s, what should the doctors have done, if anything? The Beaucoudrays initiated proceedings for a medical review panel. At the time those proceedings were commenced there were, in addition to Dr. Bennett and Dr. Walsh, numerous other health care providers in several specialties, who also were alleged to have committed medical malpractice. The medical review panel issued an opinion, the timeliness of which it appears the Beaucoudrays challenged in a separate action allotted to a different district judge than in these proceedings.
 
 [7]
 

 Upon completion of the medical review panel process, the Beaucoudrays filed their petition for damages. After some preliminary motions, the suit proceeded to trial against only Dr. Bennett and Dr. Walsh. No defendants settled with the Beaucoud-rays in return for their dismissal.
 

 Numerous pretrial motions, including motions
 
 in limine,
 
 preceded trial and some of those rulings are the subject of this appeal. After a nine-day trial at which |, numerous expert and lay witnesses testified, the jury returned a unanimous verdict in favor of the defendants.
 

 In response to the first interrogatory on the verdict form, the jury found that the Beaucoudrays had failed to prove the standard of care by a preponderance of the evidence. Consistent with the verdict form instructions, the foreperson signed the vei*dict form; the jury discontinued deliberations and returned to the courtroom. The jurors were individually polled and confirmed them verdict. A judgment consistent with the verdict was signed, and this timely devolutive appeal by the Beau-coudrays followed.
 

 3
 

 ASSIGNMENTS OF ERROR
 

 The Beaucoudrays have assigned four errors for review. Importantly, they do not directly challenge the verdict of the jury on liability.
 

 Two errors assigned are evidentiary in nature and could be pertinent to liability issues: (1) that the trial judge erroneously admitted the medical review panel (hereafter “MRP”) opinion into evidence, or, alternatively, that he failed to redact por
 
 *923
 
 tions referring to defendants who were previously dismissed, and (2) that the defendants’ motion
 
 in limine
 
 to exclude evidence regarding a defense expert witness’s background was erroneously granted. The two remaining errors assigned relate to issues of damages: (1) that the trial court misapplied the legal standard on the theory of lost chance of recovery, and (2) that evidence regarding third-party fault and failure to mitigate damages was erroneously admitted.
 

 _b4
 

 DISCUSSION
 

 Threshold Question in a Medical Malpractice Case: Deviation from the Appropriate Standard, of Care
 

 The Louisiana Supreme Court as early as 1994 set forth the burden of the plaintiff in a medical malpractice case: “[T]he plaintiff must establish the standard of care applicable to the charged physician, a violation by the physician of that standard of care, and a causal connection between the physician’s alleged negligence and the plaintiffs injuries resulting therefrom.”
 
 Pfiffner v. Correa,
 
 94-0924, 94-0963, 94-0992 (La.10/17/94) 643 So.2d 1228, 1232. The Pfiffner Court emphasized that the threshold issue which the plaintiff must win is that of proving by a preponderance of the evidence that the defendant(s) deviated from the standard of care, as required by La. R.S. 9:2794, which provides in pertinent part:
 

 A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., ...,
 
 the plaintiff shall have the biorden of proving:
 

 (1)The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues pecidiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, ... within the involved medical specialty.
 

 (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
 

 (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of 11 scare the plaintiff suffered injuries that would not otherwise have been incurred.
 

 [[Image here]]
 

 In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician,.... The jury shall be further instructed that injury alone does not raise a presumption of the physician’s ... negligence.
 

 See Ruiz v. Guette,
 
 07-0989, p. 9 (La.App. 4 Cir. 4/23/08), 983 So.2d 959, 964;
 
 Sam-aba v. Rau,
 
 07-1726, pp. 5-6 (La.2/26/08), 977 So.2d 880, 883-84.
 

 Previously, this court set forth the burden of proof in medical malpractice cases as follows:
 

 In a medical malpractice action against a physician, the plaintiff carried a two-fold burden of proof. The plaintiff must
 
 first
 
 establish by a preponderance of the evidence that the doctor’s treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a
 
 *924
 
 causal relationship between the alleged negligent treatment and the injury sustained. (emphasis added).
 

 Galen-Med, Inc. v. Porter,
 
 05-0788, p. 13 (La.App. 4 Cir. 3/29/06), 928 So.2d 681, 688.
 
 [8]
 

 The parties presented conflicting expert medical testimony on the issue of the correct standard of care, which the jury resolved in favor of the defendant doctors. In a medical malpractice action, the assessment of factual conflicts, including those involving the contradictory testimony of expert witnesses, lies within the providence of the jury as trier of fact.
 
 Ruiz v. Guette,
 
 07-0989, p. 5 (La.App. 4 Cir. 4/23/08), 983 So.2d 959, 962. “Where medical experts express differing views, judgments and opinions, | 14great deference is given to the fact finder’s determinations, which should not be reversed on appeal unless the reviewing court concludes that no reasonable factual basis exists for them.”
 
 Id,
 
 07-0989, p. 6, 983 So.2d 962-963. “The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the' fact finder’s conclusion was a reasonable one.”
 
 Adams v. Rhodia, Inc.,
 
 07-2110, p. 10 (La.5/21/08), 983 So.2d 798, 806,
 
 writ granted (on another issue)
 
 08-0185 (La.9/19/08), 992 So.2d 968,
 
 citing Stobart v. State, Dept. of Transp. And Dev.,
 
 617 So.2d 880, 882 (La.1993).
 
 [9]
 

 The jury was presented with a jury verdict form in which the first question required them to decide:
 

 Did plaintiff prove by a preponderance of the evidence the degree of knowledge or skill possessed or the degree of care ordinarily exercised by a pediatric ortho-paedic surgeon and pediatric neurosurgeon under the same or similar circumstances as Dr. Bennett and Dr. Walsh?
 

 To this interrogatory the jury unanimously answered “No.”
 

 The Beaucoudrays’ expert, Dr. King, who was a subsequent treating physician of Todd Beaucoudray, testified that the standard of care required physicians in the defendants’ specialties to perform decompression surgery immediately upon discovering a neurologic deficit during or after the
 
 in situ
 
 surgery. His opinion was challenged by the defendants because he had himself 11ficonsulted with, and deferred to the expertise of, Dr. Robert Winter, the defendants’ expert witness. Moreover, the defendants challenged his expertise because he failed to review Todd’s medical records and test results, and neglected to perform additional tests prior to performing Todd’s decompression surgery.
 

 Additionally, the defendants showed that in his own practice Dr. King appeared to have medical outcomes which conflicted with his stated opinion in this case. In one case, Dr. King did not perform the decom
 
 *925
 
 pression surgery that he testified was the standard of care. In another case, he performed the surgery but obtained no better result. Finally, defense experts opined that Dr. King’s decompression surgery may have caused new compression on Todd’s spinal cord, worsening Todd’s condition.
 

 On the standard of care issue Dr. Bennett and Dr. Walsh, in addition to their own sworn testimony and that of Dr. Winter, offered the expert testimony of Dr. Howard Katz and Dr. Rodney Steiner. These physicians all maintained that the best course was the one followed by the defendants, namely to administer steroids and determine what functionality returned over time, particularly when there was no evidence of compression warranting immediate decompression surgery. They basically testified that there is no hard and fast rule in these situations, particularly since Todd’s spinal structure was very rare. They opined that there is an insufficient body of evidence, made up of enough cases and experience, to conclude that the decompression surgery must be or even ought to be performed.
 

 11fiDr. Winter specifically testified that Dr. King misapplied sections of a textbook Dr. Winter co-authored on the advisability or necessity of decompression surgery, and that his own testimony about the standard of care was consistent with his publications. All of the defense expert witnesses testified that the defendants acted within the standard of care. While the MRP opinion did not specifically set forth the standard of care, it did conclude that neither Dr. Bennett nor Dr. Walsh had violated the standard of care.
 

 The Beaucoudrays attribute the jury’s deciding the threshold issue-that they failed to show the physicians’ deviation below the standard of care-against them to the following assigned errors:
 

 Assigned Error 1: Unredacted Medical Review Panel Opinion
 

 The Beaucoudrays complain that the trial judge erred in admitting the MRP opinion as substantive evidence for the jury to consider. The MRP opinion reads:
 

 The Medical Review Panel, composed of the undersigned, having reviewed the evidence submitted by the parties, given notice to the parties with reference to their right to convene the Panel for questioning, having made the evidence available to the parties and having met in consideration of same, the Panel renders the following opinion.
 

 1. The evidence does not support the conclusion that Dr. James T. Bennett, Dr. Daniel R. Laster, Dr. John W. Walsh, Dr. John Willis, Dr. Rodney B. Steiner, Dr. Johnnie Frentz, Dr. Judy Johnson, University Healthcare System, L.L.C. d/b/a Tulane University Hospital and Clinic and The Administrators of The Tulane Education Fund a/b/a Tulane Medical School failed to comply with the appropriate standard of care as alleged for the reasons shown on the attached Exhibit “A”.
 

 Opinion rendered this 5th day of June, 2002.
 

 The MRP opinion was signed by the three health care panel members and the attorney panel chairman. Exhibit “A” was headed “REASONS” and set forth:
 

 |171) There is nothing in the records which supports a failure to comply with the appropriate standard of care;
 

 2) The patient had documented growth hormone deficiency;
 

 3) The growth hormone deficiency was treated appropriately; •
 

 4) Monitoring was appropriate;
 

 5) Termination of growth hormone therapy was appropriate;
 

 
 *926
 
 6) Recommendation of surgery to prevent progression was appropriate to decrease the risk of worsening neuro-logic status;
 

 7) Neurologic deficit was recognized and managed appropriately;
 

 8) Paralysis was a rare, but recognized complication of procedure; and
 

 9) Anesthesia management was appropriate.
 

 The MRP and its opinion are part of an extensive statutory scheme approved by the Louisiana Legislature in 1975 in the Medical Malpractice Act. La. R.S.40:1299.41
 
 et seq.
 
 This act was in response to a perceived medical malpractice crisis in the state.
 
 Spradlin v. Acadia-St. Landry Medical Foundation,
 
 98-1977, p. 6 (La.2/29/00), 758 So.2d 116, 120. The intended purposes of the act were to reduce or stabilize medical malpractice insurance rates and to assure the availability of affordable medical services to the general public.
 
 Hutchinson v. Patel,
 
 93-2156, p. 3 (La.5/23/94), 637 So.2d 415, 419. In order to achieve these ends, one of the principal advantages provided to qualified health care providers was that no action for malpractice against them or their insurers may be commenced in any court prior to submission of the complaint to a MRP, and the panel’s issuance of its expert opinion on the merits of the complaint, unless the requirement is waived by the parties’ agreement.
 
 Id.,
 
 p. 4, 637 So.2d at 419
 
 discussing
 
 La. R.S. 40:1299.47;
 
 Delcambre v. Blood Systems, Inc.,
 
 04-0561, pp. 4-5 (La.1/19/05), 893 So.2d 23, 26-27;
 
 Graham v. Willis-Knighten Medical, Center
 
 97-0188, p. 5 (La.9/9/97), 699 So.2d 365, 367-368;
 
 Everett v. Goldman,
 
 359 So.2d 1256 (La.1978).
 

 In
 
 Samaha,
 
 07-1726, p. 17, 977 So.2d at 890, the Louisiana Supreme Court commented that under the law each of the panelists before undertaking his duties must take an oath swearing or affirming as to his identity and stating that he will faithfully perform his duties to the best of his ability and without partiality or favoritism of any kind, and that he will render a decision in accordance with the law and evidence presented to him.
 
 [10]
 

 “The panel shall have the sole duty to express its opinion as to whether or not the evidence supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care.” La. R.S. 40:1299.47(G). Its opinion is not binding on the litigants. Pre-suit screening through a MRP is designed to weed out frivolous claims without the delay or expense of a full court trial.
 
 Everett,
 
 359 So.2d at 1263-1264. A MRP opinion adverse to a patient does not preclude the filing of a lawsuit against the qualified healthcare providers.
 
 Id.,
 
 359 So.2d at 1269. The provision of La. R.S. 40:1299.47(H), which states that the panel opinion is not “conclusive”, means only that the panel opinion, whatever conclusion is reached, “does not preclude the subsequent filing of a lawsuit.... ”
 
 Sam,aha,
 
 07-1726, p. 15, 977 So.2d at 889.
 

 La. R.S. 40:1299.47(H) provides that “[a]ny report of the expert opinion reached by the medical review panel
 
 shall,
 
 be admissible as evidence in any action | ^subsequently brought by the claimant in a court of law, but such expert opinion shall not be conclusive .... ” (emphasis added). The MRP opinion is admissible as expert medical evidence and may be used to support or oppose any subsequent medi
 
 *927
 
 cal malpractice suit. As with any expert testimony or evidence, the MRP opinion is subject to review and contestation by an opposing view point.
 
 Id.,
 
 07-1726, p. 15, 977 So.2d 890. The opinion can therefore be used by either the patient or the physician. The jury, as trier of fact, is free to accept or reject any portion or all of the opinion.
 
 Everett,
 
 359 So.2d at 1269.
 

 The Beaucoudrays contend that the MRP’s authorization had expired prior to rendering its opinion, and
 
 ipso facto
 
 the MRP opinion was excludable. La. R.S. 40:1299.47(B)(l)(b) provides that “if an opinion is not rendered by the panel within twelve months after the date of notification of the attorney chairman by the executive director ... suit may be instituted against a health care provider covered by this Part.” An extension of an additional twelve-month period may be obtained from a court of competent jurisdiction “for good cause shown.” The final sentence declares that after the first twelve-month period and any court-ordered extension, “the medical review panel established to review the claimant’s complaint shall be dissolved without the necessity of obtaining a court order of dissolution.” From the record of these proceedings, we are unable to determine the merits of the Beaucoudrays’ argument.
 

 In these proceedings, the Beaucoudrays raised the issue by a motion
 
 in limine
 
 in which they asserted, without any supporting documentation, that the Impanel had expired prior to its “renewal.” The Beau-coudrays contend that the panel expired on January 6, 2002. However, their motion does not explain how they arrived at this date. The application for an extension of the panel life was not filed in this proceeding, and no evidence from other proceedings is included in this record.
 

 The operative date to calculate the various twelve-month periods is the date on which the attorney chairman was notified of his appointment. The parties have not furnished us with this date. A district judge other than the trial judge presided over the extension proceedings and apparently rejected the Beaucoudrays’ contentions that the panel had expired. The Beaucoudrays failed to establish either in the trial court, or in this court, the merits of their contention that the MRP had expired before the rendering of its opinion.
 

 The admissibility of the MRP opinion itself, as well as the supporting testimony of panel members, is unquestioned, such that the exclusion of a panelist’s prior testimony in support of the MRP is reversible error.
 
 Galloway v. Baton Rouge General Hospital,
 
 602 So.2d 1003, 1005 (La.1992).
 
 In Galloway,
 
 MRP members expressed one opinion at the first trial of a physician, finding that the physician had not deviated from the standard of care but that the hospital had. That trial resulted in a directed verdict for the physician. At the subsequent trial against the hospital, the same testifying physicians now found that the hospital had not deviated from the standard of care. The Louisiana Supreme Court held that not only the panel’s finding, but also the testimony and depositions given thereafter | .¿iwhich support the panel finding, are admissible pursuant to statute.
 
 Id.
 
 at 1007.
 
 A fortiori,
 
 any exclusion of the MRP opinion itself by the trial court would be reversible error. Further, a simple reading of La. R.S. 40:1299.47(H) mandates the admissibility of the MRP opinion.
 

 The Beaucoudrays provide no legal authority for their contention that the MRP opinion should have been redacted to exclude evidence of other health care providers. They do not show how they were prejudiced
 
 if
 
 the jurors concluded that plaintiffs had settled with the dismissed defendants, nor do they explain how the
 
 *928
 
 jury would be confused by the mere mention of dismissed defendants when the trial testimony clearly centered on the surgeons’ actions. The substance of the opinion confines itself to the pertinent issues at trial.
 
 [11]
 

 The trial court was not only correct, it was legally required to admit the MRP opinion into evidence.
 

 Assignment of Error 2: Evidence about Dr. Winter
 

 The Beaucoudrays also complain that the trial court erroneously granted the defendants’ motion
 
 in limine,
 
 which resulted in the exclusion of evidence regarding an expert witness, Dr. Robert Winter, who ultimately testified on behalf of Dr. Bennett and Dr. Walsh. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and 122when the ruling is one excluding evidence, the substance of the evidence must be made known to the court by counsel. La. C.E. art. 103(A) and (A)(2).
 

 The evidence which the defendants sought to exclude related to Dr. Winter’s consensual sexual involvement with one patient on an occasional basis from 1980 through 1984. Medical disciplinary authorities in the state of Minnesota, where Dr. Winter was licensed and where he principally practiced medicine, had instituted proceedings in 1993 against him for the ethical violations associated with his involvement with the patient. The records of the disciplinary action taken against Dr. Winter in 1993 disclose that there was no criminal wrongdoing on his part, as well as no finding of deceit or dishonesty on his part in his dealings with the disciplinary authorities. The discipline imposed did not materially restrict Dr. Winter in the practice of medicine.
 
 [12]
 
 Less than two years later, and before Todd Beaucoud-ray’s surgery, Dr. Winter’s license to practice medicine without any conditions was restored to him.
 

 The Beaucoudrays argue that the excluded material was directly related to Dr. Winter’s credibility, and that the jury was entitled to hear that information. They also argue that they were denied meaningful cross-examination that went to the heart of the defendants’ expert’s credibility-
 

 Admissibility of evidence is at the trial court’s discretion, which will not be disturbed on appeal absent a showing of abuse of discretion.
 
 Glapion v. Bergeaux,
 
 01-1865, p. 13 (La.App. 4 Cir. 12/11/02), 884 So.2d 1141, 1149. Indeed, a trial | sajudge has much discretion to regulate the evidence a jury hears.
 
 Hasney v. Allstate Ins. Co.,
 
 00-0164, p. 12 (La.App. 4 Cir. 2/7/01), 781 So.2d 598, 605. A reviewing court is prohibited from reversing a harmless error.
 
 Preatto v. Tidewater Marine, Inc.,
 
 00-0624, p. 11 (La.App. 4 Cir. 2/6/02), 809 So.2d 1084, 1091,
 
 citing Hasney,
 
 00-0164, pp. 13-14, 781 So.2d 598, 606.
 

 The Beaucoudrays do not attack Dr. Winter’s expert credentials and, indeed, to some extent rely upon Dr. Winter’s expertise and testimony to support their view that a decompression should have been immediately performed by the defendants. Todd’s subsequent treating physician, Dr. King, who also appeared as an expert witness for the Beaucoudrays, testified that
 
 *929
 
 he himself had telephoned and consulted with Dr. Winter prior to performing the decompression surgery on Todd because Dr. Winter was a renowned expert in this area, including having published works on the appropriate use of decompression of the spine.
 

 At the hearing on the motion
 
 in limine
 
 the following note of evidence was accepted by the trial judge:
 

 In fact, Dr. Winter’s license is effective through June of 2002. In fact, Dr. Winter was performing surgery through the year for one year after the surgery in this case. In fact, Dr. King brought Dr. Winter to New Orleans to present lectures at Children’s Hospital with regard to surgical procedures in this very area during this period of time. In fact, Dr. Winter as noted in the record has written more books, coauthored more chapters of books, written more articles and is recognized as the best expert in the world in this particular area of kyphos-coliosis.
 

 12-iThe trial court found the evidence of Dr. Winter’s disciplinary problems was relevant under La. C.E. arts. 401 and 402. Next, the trial judge weighed the relevance in light of La. C.E. art. 403, which provides:
 

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
 

 In balancing the probative value of the evidence against the danger of its unfair prejudice, the trial judge expressly considered the remoteness in time of Dr. Winter’s professional transgressions with their sexual nature. A trial court should consider the improper inferences a jury might make from evidence of a physician’s personal history and of a medical licensing board’s reports when balancing the probative value of evidence with the
 
 danger
 
 of its unfair prejudice.
 
 Glapion,
 
 01-1865, pp. 4-5, 834 So.2d 1141,1144-1145.
 

 The Beaucoudrays cite three cases in urging error of the trial court:
 
 Adeola v. Kemmerly,
 
 01-1231 (La.App. 1 Cir. 6/21/02), 822 So.2d 722,
 
 Brown v. Avondale Shipyards, Inc.,
 
 413 So.2d 183 (La.App. 4th Cir.1982), and
 
 Jackson v. Ed's Cab Co.,
 
 333 So.2d 701 (La.App. 4th Cir.1976). Because these cases are each directed to the specific issue of a trial court’s control of cross-examination of an expert witness primarily on his credentials or expertise, these cases are not dispositive here. In
 
 Adeola,
 
 the defendant sought to question the expert witness after he had already been accepted as such after a long and elaborate
 
 Daubert
 
 hearing.
 
 Adeola,
 
 01-1231, p. 8, 822 So.2d at 727. In
 
 Brown,
 
 citing Jackson, the court held that expert witnesses, unlike fact witnesses, are privileged and empowered to express opinions based upon expertise. “To be thus empowered, expert witnesses may first be obliged to respond to interrogation questioning their ^expertise.”
 
 Brown,
 
 413 So.2d at 184 (emphasis added.) In this case, the excluded evidence does not reflect upon Dr. Winter’s expertise, which the Beaucoudrays do not in any event question. The evidence of Dr. Winter’s misconduct reflects on his character, but as far as we can tell from the facts before us, not on his character for truthfulness or untruthfulness. Admissibility of evidence of a witness’s “character, such as a moral quality” is governed by La. C.E. arts. 607-609.
 
 [13]
 
 La. C.E. art. 404(A)(3).
 

 La. C.E. art. 607 provides:
 

 
 *930
 
 A. Who may attack credibility. The credibility of a witness may be attacked by any party, including the party calling him.
 

 B. Time for attacking and supporting credibility. The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked. However,
 
 a party may question any witness as to his relationship to the parties, interest in the lawsuit, or capacity to perceive or to recollect.
 

 C. Attacking credibility intrinsically. Except as otherwise provided by legislation, a party,
 
 to attack the credibility of a ivitness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.
 

 D. Attacking credibility extrinsieally. Except as otherwise provided by legislation:
 

 (1) Extrinsic evidence to show a witness’ bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
 

 (2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness’ testimony, is admissible when offered solely to attack the credibility of a witness
 
 unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
 

 (Emphasis added)
 

 12nThis article itself contains the same balancing test as La. C.E. art. 403 that must be performed by the court in its decision whether to admit evidence attacking credibility.
 
 Preatto,
 
 00-0624, p. 10, 809 So.2d at 1090.
 

 We note that the trial court otherwise permitted the Beaucoudrays the unrestricted opportunity to cross-examine Dr. Winter on all other issues, including his relationship to the defendants, his interest in the lawsuit, his fees, his practice, research, publications, teaching activities, and surgeries performed. La. C.E. 607(B).
 

 La. C.E. art. 608 sets forth the statutory restriction for attacking credibility of a witness with character evidence:
 

 A. Reputation evidence of character.
 
 The credibility of a witness may be attacked or supported by evidence in the fomi of general reputation only, but subject to these limitations:
 

 (1) The evidence may refer only to character for truthfulness or untruthfulness.
 

 (2) A foundation must first be established that the character witness is familiar with the reputation of the witness whose credibility is in issue. The character witness shall not express his personal opinion as to the character of the witness whose credibility is in issue.
 

 (3)
 
 Inquiry into specific acts on direct examination while qualifying the character witness or otherwise is prohibited.
 

 B. Particular acts, vices, or courses of conduct.
 
 Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Ani-eles 609 and 609.1 or as constitutionally required.
 

 
 *931
 
 C. Cross-examination of character witnesses. A witness who has testified to the character for truthfulness or untruthfulness of another witness may be cross-examined as to whether he has heard about particular acts of that witness bearing upon his credibility. (Emphasis added.)
 

 |27We see from article 608 that the use of reputation evidence of the character of a
 
 tuitness
 
 to attack his credibility is limited to the witness’s “character for truthfulness or untruthfulness” and moreover that particular acts, vices, or courses of conduct of a witness cannot be proved by extrinsic evidence other than conviction of crime or as constitutionally required, neither of which applies. The plaintiffs conceded that the evidence regarding Dr. Winter did not involve criminal charges. Therefore, it is clear that the evidence of the Minnesota licensing authorities’ discipline of Dr. Winter could not be introduced under article 608.
 

 Apart from cross-examination, Louisiana law does not permit the independent introduction into evidence of a defendant-physician’s similar medical treatment of other patients.
 
 In re Cerniglia v. French,
 
 00-2768, 00-2769, pp. 5-8 (La.App. 4 Cir. 4/3/02), 816 So.2d 319, 323-325. In
 
 Cemiglia,
 
 the proposed questioning addressed the doctor’s “similar acts” in his medical treatment of other patients besides the plaintiff in his practice: he allegedly performed the identical surgical procedure on two other patients besides the plaintiff, and these two people had similar adverse results to the plaintiffs. In this case, Dr. Winter did not treat Todd Beaucoudray; thus introduction of character evidence against Dr. Winter was properly excluded by the trial court.
 

 Remaining Assigned Errors
 

 In their two remaining assignments of error, the Beaucoudrays assert that the trial court “misapplied” the law on the issue of lost chance of recovery
 
 [14]
 
 and permitted the introduction of evidence of third party fault of Dr. King. Because the 12sjury found that the Beaucoudrays did not prove the standard of care and we conclude that the jury’s determination on that issue is a reasonable one, we do not address these remaining assignments of error.
 

 5
 

 CONCLUSION
 

 We conclude that the evidentiary ruling by the trial court to admit the MRP opinion was correct and that its ruling to exclude the evidence of Dr. Winter’s misconduct was not an abuse of its discretion. Finally, we find that the jury’s verdict was a reasonable one based upon all the evidence.
 

 DECREE
 

 For the foregoing reasons, the judgment of the trial court, which was based entirely upon the verdict of the jury and which dismissed the plaintiffs’ suit with prejudice at their cost, is affirmed.
 

 AFFIRMED.
 

 [1]
 

 . There were several other defendant health care providers who were voluntarily dismissed after the commencement of the rnedical review panel proceedings but before trial on the merits. Their identities are set forth later in this opinion.
 

 [2]
 

 . Scoliosis is a medical condition in which a person’s spine is curved from side to side, shaped like an "s”, rather than a straight line. Normal kyphosis is the two backward curves seen in the thoracic, or chest area of the spine. Abnormal kyphosis is defined by an excessive outward curve of the spine.
 

 [3]
 

 . Todd’s mother reported to the physicians in September of 1997, shortly before surgery, that she was concerned that Todd was walking with a limp. Follow-up testing was conducted to monitor any possible deterioration prior to the scheduled surgery date.
 

 [4]
 

 . Somatosensory evoked potentials (SSEP's) are used to assist in the clinical diagnosis of patients with neurologic diseases. At the time of Todd’s surgery, SSEP’s were also used to monitor surgical procedures.
 

 [5]
 

 . Dr. Bennett was unaware that Todd was under Dr. King’s care until the two physicians spoke with each other at a professional function in May 1998. This was after Dr. King performed surgery on Todd, oversaw his therapy, and discharged him.
 

 [6]
 

 . The defendants suggested that the massive bleeding would not have been a surprise to Dr. King had he reviewed the records from Tulane University Medical Center, whose my-elograms, as well as operative notes, showed that the area was very vascular.
 

 [7]
 

 . We do not have any record of those proceedings and rely upon the assertions of counsel in reporting those proceedings. We have no record in our court that any review was taken from any rulings in those proceedings.
 

 [8]
 

 . In
 
 Smith v. State, Dept. Health & Hosp.,
 
 95-0038, p. 6 (La.06/25/96), 676 So.2d 543, 547, the Supreme Court explained that "[ajilowing recovery for the loss of chance of survival is not, ..., a change or relaxation of the usual burden of proof by a preponderance of the evidence.... There is no variance from the usual burden in proving that distinct loss."
 
 See also, Hebert v. Parker,
 
 00-0686, pp. 8-9 (La.App. 4 Cir. 5/23/01), 796 So.2d 19, 25-26.
 

 [9]
 

 . "Further, where the findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the findings of fact. Indeed, whether the fact finder’s determination is based on its decision to credit the testimony of one of two witnesses, that finding can virtually never be manifestly erroneous. This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony.”
 
 Adams,
 
 07-2110 p. 10, 11, 983 So.2d. at 806-807,
 
 citing Lasyone v. Kansas City Southern Railroad,
 
 00-2628, p. 13 (La.4/3/01), 786 So.2d 682, 693.
 

 [10]
 

 . In this case, the executed notarized oaths are attached to the opinion, which was admitted into evidence, over objection.
 

 [11]
 

 .
 
 See generally
 
 La. C.E. arts. 101-103 and 401-403 discussed below.
 

 [12]
 

 . Dr. Winter was required to refrain from sexual conduct with patients, attend psychotherapy sessions, meet quarterly with a monitor, and pay a $1,000 fine along with some other incidental reporting requirements.
 

 [13]
 

 . La. C.E. art. 609 applies to criminal convictions in civil cases and has no application
 
 *930
 
 in this case.
 

 [14]
 

 . In their brief, the Beaucoudrays limit their complaint on this issue to witness testimony; it does not extended to arguments of counsel, the jury instructions, or the jury interrogatories. Jury interrogatory # 3 read: "Did plaintiff prove by a preponderance of the evidence that either lack of knowledge or skill or failure to exercise reasonable care by Dr. Bennett or Dr. Walsh caused Todd Beaucoud-ray to lose a better chance of recovery of function after the intra-operative onset of paralysis?”