983 So.2d 959 (2008)
Jennifer RUIZ
v.
Dr. Andre GUETTE, Children's Hospital and Dr. George Cowan.
No. 2007-CA-0989.
Court of Appeal of Louisiana, Fourth Circuit.
April 23, 2008.
*960 Fred L. Herman, Thomas J. Barbera, Daniel W. Nodurft, Law Offices of Fred L. Herman, J. Van Robichaux, Jr., Robichaux Law Firm, New Orleans, LA, for Plaintiff/Appellant.
Stephen M. Pizzo, Guice A. Giambrone III, Christina M. Soileau, Blue Williams, L.L.P., Metairie, LA, for Dr. Andre Guette.
(Court composed of Judge CHARLES R. JONES, Judge DENNIS R. BAGNERIS, SR., Judge TERRI F. LOVE).
TERRI F. LOVE, Judge.
Ms. Ruiz appeals the district court's ruling that Dr. Guette did not breach the applicable standard of care in his treatment of Ms. Ruiz. We find the trial court *961 was not manifestly erroneous in holding that Dr. Guette did not breach the standard of care and even if it were proven that Dr. Guette failed to timely diagnose her endometriosis, such failure did not contribute to or cause Ms. Ruiz's injuries. We affirm.

FACTUAL AND PROCEDURAL HISTORY
The plaintiff, Ms. Jennifer Ruiz ("Ms. Ruiz"), began seeing Dr. Andre Guette ("Dr. Guette"), an obstetrician/gynecologist in February 1999 at age 15. She complained of severe vaginal bleeding and abdominal pain. Upon examination, Dr. Guette found dark blood in the vaginal vault and assessed that Ms. Ruiz had dysfunctional uterine bleeding and dysmenorrhea. Dr. Guette prescribed Ms. Ruiz Anaprox DS[1].
In August 1999, Dr. Guette prescribed Ms. Ruiz Anaprox DS, Alesse 28[2] for 3 cycles and Phenergan. In November 1999, Ms. Ruiz returned to Dr. Guette complaining of acne. Dr. Guette examined Ms. Ruiz and found that she had acne lesions on the face and a normal breast exam. Dr. Guette prescribed a trial of Lo Estrin 1/20[3].
Later in November 1999, Ms. Ruiz called Dr. Guette's office and presented to his office the next day with complaints of having brownish discharge for several days with cramps and low back pain. Dr. Guette performed an examination of Ms. Ruiz, which revealed a soft, non-tender abdomen, and blood and mucus in her vaginal vault. Dr. Guette assessed that Ms. Ruiz probably had break-through bleeding and tested her for chlamydia and gonorrhea. The tests for chlamydia and gonorrhea had negative results.
In December 1999, Ms. Ruiz presented to the Emergency Room at Children's Hospital with complaints of abdominal pain and swelling. She underwent an abdominal ultrasound, which had negative results.
Ms. Ruiz was admitted to the hospital on the following day under the care of Dr. George Cowan. Dr. John Udall diagnosed Ms. Ruiz with constipation after he was consulted by Dr. Cowan and the only abnormality he identified was a large amount of fecal matter in her colon upon x-ray.
In January 2000, Ms. Ruiz called Dr. Guette's office with complaints of no menstrual cycle, abdominal pain and swelling. Dr. Guette noted that she was on oral contraceptive therapy, and recommended that she make an appointment. Suffering with constipation, Ms. Ruiz had a CT scan performed at Children's Hospital in January 2000. Dr. Guette received a report of the scan, which showed normal findings.
Ms. Ruiz had an appointment with Dr. Guette in April 2000, during which she reported no problems. Dr. Guette noted Ms. Ruiz's past medical history of fecal impaction and that she was currently on Alesse 28. Dr. Guette performed a Pap smear and examination on Ms. Ruiz, both of which had normal results. Dr. Guette recommended that Ms. Ruiz continue on Alesse and recommended a return visit in one year.
Ms. Ruiz called Dr. Guette in October 2000, with complaints of break-through bleeding for two weeks, for which Dr. Guette recommended continuing birth control pills. Dr. Guette instructed Ms. Ruiz to call for an appointment if the bleeding continued into her next menstrual cycle, *962 which was his last contact with the Ms. Ruiz.
In January 2001, Ms. Ruiz presented to Dr. Eric Schultis, with complaints of pain during three days of each menstrual cycle that were so severe she stayed in bed and missed school. Ms. Ruiz stated that she took Anaprox for pain. Dr. Schultis opined that Ms. Ruiz had dysmenorrhea and dyspareunia and recommended a laparoscopy. The following day, Dr. Schultis performed a pelvic ultrasound on Ms. Ruiz, which revealed a retroverted uterus and solid ovaries. Ms. Ruiz was admitted to Chalmette Medical Center later in January 2001, under Dr. Schultis' care, and he performed a laser video laparoscopy on Ms. Ruiz.
In December 2001, Ms. Ruiz returned to Dr. Schultis, and took a urine pregnancy test, which returned a positive result. Thereafter, Ms. Ruiz delivered a child in August 2002.
In December 2002, Ms. Ruiz presented to Dr. Schultis complaining of increasing pelvic pain. Dr. Schultis diagnosed Ms. Ruiz with endometriosis and recommended laparoscopic laser therapy as treatment. Surgery was performed on Ms. Ruiz in February 2003.
In October 2003, Ms. Ruiz presented to Dr. Schultis with complaints of break-through bleeding and pelvic pain for which he recommended a laparoscopic presacral neurectomy. In December 2003, Ms. Ruiz underwent fulguration of endometriosis, a presacral neurectomy and uterine suspension.
Ms. Ruiz was later treated by Dr. Andrew Montz for pelvic pain complaints. A dilation and curettage (D & C) procedure was performed by Dr. Montz, and a total abdominal hysterectomy was performed by Dr. Montz in July 2005.
Subsequently, Ms. Ruiz filed suit, alleging that Dr. Guette failed to properly examine her, order proper diagnostic tests and diagnose endometriosis, thereby causing her pain, suffering and permanent injury to the uterus and disability. The trial court found in favor of Dr. Guette and dismissed Ms. Ruiz's claim with prejudice.

STANDARD OF REVIEW
In a medical malpractice action against a physician, a plaintiff must first establish by a preponderance of the evidence that the physician's treatment fell below the ordinary standard of care that is expected of physicians in his medical specialty, and, secondly, the plaintiff must establish a causal relationship between the alleged negligent treatment and injury sustained. Martin v. East Jefferson Gen. Hosp., 582 So.2d 1272, 1276 (La.1991), (citing, La.Rev.Stat. 9:2794; Smith v. State through DHHR, 523 So.2d 815, 819 (La. 1988); Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 723 (La.1986)). Resolution of each of these inquiries are determinations of fact which should not be reversed on appeal absent manifest error. Id. (citing, Housley v. Cerise, 579 So.2d 973 (La.1991); Smith, 523 So.2d at 822; Rosell v. ESCO, 549 So.2d 840 (La.1989); Hastings, 498 So.2d at 720).
"In a medical malpractice action, the assessment of factual conflicts, including those involving the contradictory testimony of expert witnesses, lies within the province of the trier of fact." Hubbard v. State, 02-1654, p. 11 (La.App. 4 Cir. 8/13/03), 852 So.2d 1097, 1103, (citing, Hunter v. Bossier Medical Center, 31,026, p. 5 (La.App.2d Cir.9/25/98), 718 So.2d 636, 640). "Where medical experts express differing views, judgments and opinions, great deference is given to the factfinder's determinations, which should not be reversed on appeal unless the reviewing *963 court concludes that no reasonable factual basis exists for them." Hubbard, 02-1654, p. 11, 852 So.2d 1097, 1103, (citing, Piro v. Chandler, 33,953, p. 4 (La.App. 2 Cir. 11/1/00), 780 So.2d 394, 397). Further, "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Martin, 582 So.2d at 1277, (citing, Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978)).

BREACH IN THE STANDARD OF CARE
The appellant argues that the trial court was clearly wrong in finding that Dr. Guette did not breach the standard of care. Therefore, the initial inquiry that we must address is whether the plaintiff proved by a preponderance of the evidence that the defendant's treatment of Ms. Ruiz fell below the ordinary standard of care. In its reasons for judgment, the trial court found that "[r]egardless of whether or not Dr. Guette should have diagnosed endometriosis at an earlier date, the treatment would have been the same."
A Medical Review Panel opined that the evidence did not support the conclusion that Dr. Guette failed to meet the applicable standard of care. At trial, the following doctors testified: Dr. Guette, Dr. Jane Miller (obstetrics and gynecology expert for the defendant), Dr. Steven Taylor (obstetrics and gynecology expert for the defendant, who specialized in fertility and chronic pelvic pain management), and Dr. William Renaudin (obstetrics and gynecology expert for the plaintiff).

TESTIMONY OF DR. MILLER
Dr. Jane Miller ("Dr. Miller"), a board certified obstetrician/gynecologist, was one of the Medical Review Panel members who reviewed this matter. The Medical Review Panel found no breach in the standard of care by Dr. Guette, and Dr. Miller testified regarding the opinion of the Medical Review Panel and the reasoning behind its finding of no breach.
Dr. Miller testified as to the signs and symptoms of endometriosis. She also testified about the usual course of treatment, which is the same as the treatment that was given by Dr. Guette. Dr. Miller opined that the treatment for endometriosis included giving pain medication, non-steroidal anti-inflammatories and birth control pills.

TESTIMONY OF DR. TAYLOR
Dr. Taylor ("Dr. Taylor"), a board certified obstetrician/gynecologist and specialist in infertility and the management of chronic pelvic pain, testified as to the standard of care in the diagnosis and treatment of endometriosis. The testimony of Dr. Taylor refuted Ms. Ruiz's claims of damages suffered from Dr. Guette's failure to diagnose her with endometriosis.
Dr. Taylor testified that it is more difficult to diagnose endometriosis in teenage girls as opposed to older women because a surgical procedure is necessary to make the diagnosis. He testified that the fact that you have to do a procedure to make a definitive diagnosis is a reason that caution is used and it is not typically done in teenagers. Dr. Taylor also testified that typically, a physician would not order a laparoscopy immediately, but, instead, do something short of that to see if the condition would go away with other medical treatment. He also stated that standard treatment is "one of the non-steroidal anti-inflammatories, such as the Anaprox that was used" and if those symptoms persist, *964 the next line of treatment would be oral contraceptives.
When asked if based on Dr. Guette's chart notes and symptoms that were reported to him, Dr. Guette should have made the diagnosis of endometriosis in a 15-year old patient, Dr. Taylor opined that he should not have necessarily made such a diagnosis. Dr. Taylor testified that the standard of care did not require Dr. Guette to perform an ultrasound. Dr. Taylor further testified that had an ultrasound been performed, it would have been normal and that he did not believe that Dr. Guette should have performed a retrovaginal exam.

TESTIMONY OF DR. RENAUDIN
At trial, Dr. Renaudin testified as to the signs and symptoms of endometriosis that Ms. Ruiz presented with, including commencement of a menstrual cycle at age 11, dysmenorrheal, dysfunctional uterine bleeding, and constipation. Dr. Renaudin also testified on Dr. Guette's failure to order a pelvic ultrasound and/or perform a diagnostic laparoscopy. Further, Dr. Renaudin gave testimony on Ms. Ruiz's inquiries on the possibility of endometriosis and Dr. Guette's failure to maintain a chart and properly document the findings, including a retroverted uterus, and prescribed a course of treatment.
Dr. Renaudin stated that in his estimation, the chart and clinical record kept by Dr. Guette were "woefully inadequate." Dr. Renaudin opined that between the chart kept by Dr. Guette and the subsequent findings, Dr. Guette did not meet the standard of care. However, Dr. Renaudin also testified that other than the "crummy records" kept by Dr. Guette, he saw "nothing that he did medically wrong." Dr. Renaudin could not say that had Ms. Ruiz's treatment begun earlier, when she was treated by Dr. Guette, that the outcome would have been different.
A physician is required to exercise that degree of skill ordinarily employed under similar circumstances by others in the profession and to use reasonable care, diligence, and judgment. Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713, 718 (La.1986). In a medical malpractice action, the plaintiff has the burden of proving, by a preponderance of the evidence, (1) that the doctor's treatment fell below the standard of care expected of a physician in his medical specialty; and (2) the existence of a causal relationship between the alleged negligent treatment and the injury sustained. Gordon v. La. State University Bd. of Supervisors, 27, 966, p. 4 (La.App. 2 Cir. 3/1/96), 669 So.2d 736, 739-40, (citing, White v. McCool, 395 So.2d 774 (La.1981); Coffin v. Board of Supervisors of Louisiana State University Agricultural and Mechanical College, 620 So.2d 1354 (La.App. 2 Cir.1993)); La.Rev.Stat. 9:2794.
"Louisiana jurisprudence has held that expert witnesses who are members of the medical profession are necessary sources of proof in medical malpractice actions to determine whether the defendant doctor possessed the requisite degree of skill and knowledge, or failed to exercise reasonable care and diligence." Martin, 582 So.2d at 1277, (citing, Frasier v. Department of HHR, 500 So.2d 858, 861 (La.App. 1st Cir.1986)). The determination of an expert's credibility is also a factual question subject to the manifestly erroneous/clearly wrong standard of review. Id., (citing Anthony v. Hospital Service District No. 1. 477 So.2d 1180, 1184 (La.App. 1st Cir.1985); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989)).
The appellant contends that given his credentials and experience in record review, evaluation and determining breaches in the standard of care, Dr. Renaudin is *965 the most experienced of all the experts who testified. The trial judge apparently found the expert testimony of Drs. Miller and Taylor, the defendant's medical experts, to be most credible. Dr. Miller, the defendant's medical expert, testified that while Ms. Ruiz was under Dr. Guette's care, the treatment she received did not fall below the appropriate standard of care. Drs. Miller and Taylor testified that the treatment given by Dr. Guette, prescription of birth control and non-steroidal anti-inflammatory medication, was the usual treatment in cases of endometriosis. Further, we make particular note of that fact that even Dr. Renaudin was unable to definitively testify as to whether Ms. Ruiz was a laparoscopy candidate during her treatment with Dr. Guette.
The trial judge's inferences from the facts of this case and the judge's determination on extensive expert testimony credibility were reasonable determinations in light of the record before this Court. After reviewing the record, we do not find that the trial judge was manifestly erroneous in making the determination that Dr. Guette's treatment of Ms. Ruiz did not fall below the ordinary standard of care expected of an obstetrician/gynecologist.

CAUSATION
The appellant assigns error to the trial court's holding that Dr. Guette's alleged failure to timely diagnose endometriosis, even if proven, did not contribute to or cause Ms. Ruiz's injuries. Therefore, we must next consider whether Ms. Ruiz proved causation by a preponderance of the evidence.
In Cangelosi v. Our Lady of the Lake Medical Center, 564 So.2d 654, 660 (La.1989), the Louisiana Supreme Court explained that the plaintiff fails to prove that, more probably than not, the injury was the result of negligence, where it is equally plausible that the defendant's negligence caused the injury as it is that the injury was caused otherwise. "The law does not require perfection in medical diagnosis and treatment." Gilliam v. Palazzo, 04-241 (La.App. 5 Cir. 8/31/04) 881 So.2d 1286, 1288. On the contrary, a doctor's professional judgment and conduct must be evaluated with regard to reasonableness under the then existing circumstances, not in terms of results or in light of subsequent events. Id., (citing, Fraser v. Ochsner Foundation Hosp., 94-380, p. 7 (La.App. 5 Cir. 12/28/94), 648 So.2d 1081, 1084).
The record reflects that Dr. Guette chose not to order tests to determine the cause of Ms. Ruiz's pain. However, expert testimony at trial established that the initial treatment for endometriosis is non-steroidal anti-inflammatories, which are followed by oral contraception. Dr. Guette prescribed this treatment. Further, Ms. Ruiz's expert, Dr. Renaudin, was unable to testify as to whether Ms. Ruiz was a candidate for laparoscopy as of the last date of treatment under the care of Dr. Guette.
The trial judge stated in her reasons for judgment that the Ms. Ruiz did not produce evidence to indicate that Dr. Guette's failure to timely diagnose endometriosis caused or contributed to her alleged injuries. Specifically, the court stated that regardless of whether or not Dr. Guette should have diagnosed endometriosis at an earlier date, the treatment would have been the same. Therefore, given the treatment prescribed by Dr. Guette and the fact that Ms. Ruiz failed to prove by a preponderance of the evidence that Dr. Guette caused her pain, suffering, permanent injury, and disability, we do not find that the trial judge was manifestly erroneous in her determination. We find that the evidence supported the trial court's *966 equally plausible conclusion that Dr. Guette's failure to diagnose Ms. Ruiz's endometriosis was not the cause-in-fact of her injuries.

DECREE
Based on the foregoing, we conclude that the trial court was not manifestly erroneous in its decision that Dr. Ruiz did not breach the applicable standard of care and that even if it were proven that Dr. Guette failed to timely diagnose endometriosis in Ms. Ruiz endometriosis, such failure was not the cause-in-fact of her damages. Therefore, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] Anaprox DS is a nonsteroidal anti-inflammatory drug.
[2] Alesse 28 is an oral contraceptive.
[3] Lo Estrin 1/20 is an oral contraceptive.