TERRI F. LOVE, Judge.
11 This is a medical malpractice case brought by Henry Gaffney (“Mr. Gaff-ney”), against Dr. Thomas Giles (“Dr. Giles”) and LSU Healthcare Network (“LSU”). The State of Louisiana on behalf of Dr. Giles and LSU seeks reversal of the trial court’s ruling finding Dr. Giles breached the standard of care when he failed to return Mr. Gaffney’s phone calls. The State claims that there is insufficient evidence to prove causation and damages, and even if Dr. Giles breached the standard of care, as a state-employed physician, Dr. Giles should not be held liable under Detillier v. Kenner Regional Medical Center.[1] Additionally, Mr. Gaffney seeks review of the trial court’s finding that Dr. Giles did not breach the standard of care for managing his Coumadin therapy as well as an increase of the damages award.
We find no error in the trial court’s judgment relative to the monitoring of Mr. Gaffney’s Coumadin treatment or the un-returned phone calls and awarded damages. Sufficient medical expert testimony was introduced at trial upon which the trial court reasonably relied to find that the proper standard of care for | ¡.managing a patient on Coumadin in 2001 was based on a physician’s medical training and experience. In that Dr. Giles relied on his medical training and over thirty years of experience when ordering Mr. Gaffney’s next blood test, the trial court did not err in finding that Dr. Giles did not breach the standard of care relative to Mr. Gaffney’s Coumadin treatment. Moreover, the trial court reasonably concluded that although Dr. Giles’ failure to return Mr. Gaffney’s calls were not the cause of Mr. Gaffney’s alleged residual damages, the unreturned calls did in fact lead to the progressive deterioration of Mr. Gaffney’s condition. Consequently, we find no manifest error in the trial court’s finding that Dr. Giles’ breach of the standard of care in this instance was the cause-in-fact of Mr. Gaff-ney’s advanced deteriorating condition. Likewise, we find the trial court did not abuse its discretion in the amount awarded in Mr. Gaffney’s favor.
Pursuant to Detillier, however, the trial court’s judgment as to the unreturned phone calls in favor of Mr. Gaffney must be entered against the State alone. Therefore, we amend the trial court’s judgment to remove Dr. Giles’ name and as amended, we affirm.

PROCEDURAL HISTORY AND FACTUAL BACKGROUND

Mr. Gaffney was diagnosed with a sinus of valsalva aneurysm of the aortic valve in 1998. He began treatment in July 2000 with Dr. Giles, a board-certified cardiologist, who ordered an echocardiogram every six months to monitor Mr. Gaffney’s aneurysm. Mr. Gaffney testified that when he began treating with Dr. | ¡¡Giles, he *1104 lived an active lifestyle, riding a bike, swimming, and exercising three times a week.
In the fall of 2000, diagnostic tests showed significant progression of Mr. Gaffney’s aneurysm, . requiring surgery. Mr. Gaffney expressed a desire to have his surgery performed at the University of Alabama at Birmingham School of Medicine (“UAB”), and Dr. Giles recommended Dr. Albert D. Pacifico (“Dr. Pacifico”). Mr. Gaffney testified that he waited for Dr. Giles to refer him to Dr. Pacifico for surgery, but in March 2001, Mr. Gaffney sent a letter with his medical records requesting Dr. Pacifico to perform his operation. In response, Dr. Pacifico agreed that Mr. Gaffney needed surgery to replace the aortic valve and asked Mr. Gaffney to arrange for a pre-operative exam. Mr. Gaff-ney testified that he reported to UAB on July 9, 2001, for his pre-surgical testing and underwent surgery the next day.
Dr. Pacifico performed a successful cardiac surgery removing Mr. Gaffney’s aortic valve and root aneurysm and replacing it with a prosthetic valve. Dr. Pacifico explained to Mr. Gaffney that because of the prosthetic valve, he would require blood thinning medication, specifically Coumadin, for the remainder of his life to prevent blood clots that could cause a stroke.[2] On July 14, 2001, Mr. Gaffney was discharged from UAB. Dr. Pacifico ordered Mr. Gaff-ney to follow |4up with his cardiologist Dr. Giles, who would manage his cardiac condition and Coumadin anti-coagulation therapy-
Dr. Pacifico placed Mr. Gaffney on five milligrams of Coumadin daily, as well as Dicloxacillin, Lopressor, Digoxin, and Ty-lox. In his letter to Dr. Giles, Dr. Pacifico provided the list of medications Mr. Gaff-ney was taking, including Coumadin. The letter did not indicate a dosage level with respect to Mr. Gaffney’s Coumadin therapy; however, Dr. Pacifico stated that Mr. Gaffney should be kept within an INR range of 3.0 and 3.5.
On July 16, 2001, Mr. Gaffney had his blood tested and results showed an INR of 3.7. At Mr. Gaffney’s first post-operative visit on July 18, 2001, Dr. Giles received the letter from Dr. Pacifico along with Mr. Gaffney’s July 16, 2001 [3] INR results of 3.7.
Mr. Gaffney testified that during his follow-up visit, Dr. Giles explained to him that his INR level was “a little high.” Similarly, Dr. Giles acknowledged at trial that Mr. Gaffney’s INR reading was “outside the range” Dr. Pacifico documented in his letter. However, Dr. Giles did not change Mr. Gaffney’s dosage, preferring to order his next PT/INR test for three weeks later. On cross-examination Dr. Giles was asked whether he knew at the time he saw Mr. Gaffney “what dosage of Coumadin [Dr.] Pacifico or UAB put Mr. Gaffney on,” and Dr. Giles responded, “[n]o.” Counsel for Mr. Gaffney also asked whether Dr. Giles knew “what [Mr. Gaffney’s] prior INR or PT result might have been in Alabama.” [ sDr. Giles conceded that “[he] did not know the number.” He also testified that he “never called UAB, nurse’s staff, [Dr.] Pacifico or anyone to find out ... what the dosage was, when [the] dosage was administered [or] what INR results might have existed.” Dr. Giles testified that he “assumed [UAB] *1105 followed the usual routine ... [and] discharged him on a dose that is a common dose.” He further stated that he relied on his “clinical judgment” to determine how long Mr. Gaffney was taking Coumadin and how much he was taking prior to his July 18, 2001 visit. Dr. Giles testified that based on his experience “when he saw Mr. Gaffney he had been on [five] milligrams of Coumadin for enough time, if he had exhibited an unusual sensitivity [he] would have seen it ... and in [his] clinical judgment in [three] weeks, [he] would look at another INR and see if he stabilize[d].”
Following his first post-operative visit with Dr. Giles, Mr. Gaffney testified that he began experiencing problems. In the late afternoon on August 3, 2001, Mr. Gaff-ney was driving when he temporarily lost vision in one eye. He testified that he pulled over and waited ten to fifteen minutes when his vision restored, and he continued home. Arriving at home in his driveway, he lost vision in his other eye and again waited a few minutes until his vision returned.
Mr. Gaffney went inside and immediately called Dr. Giles’ office.[4] He testified at trial that he spoke with someone in the office who informed him that Dr. Giles had just left. Mr. Gaffney testified that he described his symptoms and |fiasked that Dr. Giles call him back. The person receiving the call then informed Mr. Gaffney that she would page Dr. Giles, and he would return Mr. Gaffney’s call. Mr. Gaff-ney testified that he never received a call back from Dr. Giles or anyone at LSU. Concerned, Mr. Gaffney testified that around nine or ten o’clock that night he called Dr. Pacifico at UAB and left a message describing his symptoms. He did not hear from Dr. Giles/LSU or Dr. Pacifi-co/UAB that night.
The next morning, Mr. Gaffney left his house early, and around mid-day he stopped to use the restroom. He testified that he observed blood in his urine and immediately returned home. Once home, he learned Dr. Pacifico returned his call from the night before and left a message advising Mr. Gaffney to follow up with Dr. Giles. Mr. Gaffney called Dr. Giles again, but after not hearing from him, Mr. Gaff-ney called Dr. Pacifico/UAB. Mr. Gaffney explained that he noticed blood in his urine, and Dr. Pacifico/UAB then instructed Mr. Gaffney to have his INR tested. However, because it was a Saturday the clinic was closed. Mr. Gaffney called UAB back to report that the clinic was closed for the day. Dr. Pacifico/UAB advised Mr. Gaffney to hold his doses of Coumadin until he was able to have an INR test performed and to follow-up with his cardiologist “first thing Monday.” Later that evening, Mr. Gaffney had a bowel movement and noticed blood in his stool. Mr. Gaffney called Dr. Pacifico/UAB and left a message. Dr. Pacifico/UAB promptly returned Mr. Gaffney’s call and instructed him to go to the emergency room.
| /There is competing evidence regarding when Mr. Gaffney arrived at the East Jefferson General Hospital (“EJGH”) emergency room. Mr. Gaffney’s emergency room medical records were not prepared until 10:40 p.m. Mr. Gaffney and Sean Gaffney, on the other hand, testified that they were fearful his “surgery was coming apart.” For that reason, Mr. Gaff-ney reported to the emergency room shortly after he spoke with Dr. Pacifi-co/UAB that evening around 7:00 p.m. It *1106 is undisputed that upon arrival Mr. Gaff-ney complained of “temporary episodes of foggy vision, blood in his urine, and blood in his stool.” He also reported that he was on a daily Coumadin regimen, so a PT/ INR test was conducted. The test indicated Mr. Gaffney’s PT was over 130 and his INR level was 11.8. Expert witnesses on both sides stated an INR level of 11.8 was well outside the recommended levels. Mr. Gaffney was informed by hospital staff that he overdosed on Coumadin. The hospital immediately halted Mr. Gaffney’s Coumadin and gave him two units of fresh frozen plasma. He was then admitted for further monitoring.
Dr. David Learned (“Dr.Learned”), the cardiologist that monitored Mr. Gaffney’s Coumadin management while in the hospital, testified that the two units of frozen plasma had the initial desired affects. By the next day, Mr. Gaffney’s INR was at 5.3. During Mr. Gaffney’s hospitalization, Dr. Learned ordered consults from cardiology for his Coumadin management, ophthalmology for his visual disturbances, urology for the blood in his urine, and neurosurgery for a subarachnoid bleed in his skull. The subsequent ophthalmologic work up included |sa CT scan of Mr. Gaff-ney’s head revealing a brain bleed. Mr. Gaffney remained hospitalized at EJGH through August 13, 2001.
The medical witnesses at trial, Dr. Robert Stark (“Dr. Stark”), Dr. David Learned (“Dr. Learned”), Dr. Giles, and defense expert Dr. Kenneth Kerut (“Dr. Kerut”), all testified that Coumadin is a patient specific drug. Each acknowledged that patient dosages must be individualized based on each patient’s response to a given dosage. Mr. Gaffney’s expert Dr. Stark testified that the Physician’s Desk Reference (PDR) provides the established standard of care for physicians prescribing and managing Coumadin. He stated that serial PT/INR testing is required and that a single INR test will not adequately indicate whether a patient’s response to a particular dosage has stabilized. Dr. Stark testified that the standard of care requires repeat PT/INR testing every two to three days until the serial tests demonstrate a stable PT/INR range. On cross-examination, Dr. Stark acknowledged that he was unaware of the American Heart Association’s position on the standard of care for prescribing and managing Couma-din.
LSU’s expert Dr. Kerut testified that the American Medical Association does not accept the PDR for establishing the standard of care for clinical practice. He stated that in 2001 there were no written policies, procedures, or standards for how often a patient’s PT/INR should be tested. Dr. Kerut testified that the guidelines for Coumadin management are established by the American College of Cardiology and the American Heart Association. However, he noted that even those are guidelines and that the standard of care for Couma-din management was |9based on a physician’s experience, training, and clinical judgment. Additionally, Dr. Kerut testified that it was common in 2001 to measure a patient’s PT/INR about every three to four weeks. Dr. Kerut also stated that the standard of care required serial testing until a patient reaches a stable range, and Mr. Gaffney’s 3.7 INR test result on July 16, 2001 was within the stable range. Therefore, in Dr. Kerut’s opinion, Dr. Giles did not breach the standard of care.
In July 2008, a Medical Review Panel convened and concluded that Dr. Giles met the standard of care regarding Mr. Gaff-ney’s Coumadin management and testing. The panel opined that the evidence did not support the conclusion that Dr. Giles breached the standard of care as charged by the complainant. The panel found that scheduling Mr. Gaffney’s PT/INR test *1107 three weeks out was within the standard of care. Dr. Stark disagreed with the panel’s findings in that with only one test result, there was no way to tell whether Mr. Gaffney’s response to Coumadin had . stabilized.
Thereafter, Mr. Gaffney filed a petition in the trial court alleging that Dr. Giles breached the standard of care by failing to properly monitor his INR levels and failing to return his phone calls when Mr. Gaffney noticed changes in his condition. The trial court found in favor of Dr. Giles and the State on behalf of LSU as to the management of Mr. Gaffney’s Coumadin therapy. However, the trial court found Dr. Giles breached the standard of care for failure to return Mr. Gaffney’s phone calls and awarded Mr. Gaffney $5,000 in damages with interest and court costs. This timely appeal follows.
| ^STANDARD OF REVIEW
A reviewing court will not disturb the trial court’s factual findings unless the finding is clearly wrong or manifestly erroneous. Lindner v. Hoffman, 04-1019, p. 4 (La.App. 4 Cir. 1/12/05), 894 So.2d 427, 430 (citing Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978)). “Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong ... [W]hen findings are based on determinations regarding the credibility of witnesses, the manifest error standard requires that great deference be afforded to the trier of fact’s findings.” Collins v. Dennis, 01-0086, p. 2 (La.App. 4 Cir. 12/5/01), 803 So.2d 1011, 1013 (internal citations omitted).
Pursuant to La. R.S. 9:2794(A), a plaintiff asserting a medical malpractice claim must prove by a preponderance of the evidence:
... the degree of care ordinarily exercised by a physician in a particular medical specialty; that the physician failed to exercise reasonable care and due diligence, along with his best judgment in the application of that skill; and that as a result of the physician’s lack of skill or knowledge, the party suffered injuries that would have not otherwise occurred. In other words, a plaintiff must prove the applicable standard of care, the breach of that standard, and that the substandard care caused an injury that the plaintiff otherwise would not have suffered. Leblanc v. Barry, 00-709, p. 3 (La.App. 3 Cir. 2/28/01), 790 So.2d 75, 78-79.
Lindner, 04-1019, p. 5, 894 So.2d at 431. Additionally, a plaintiff as well as the fact finder relies in large part on the testimony of expert witnesses to establish the applicable standard of care. See La.C.Cr.P. art. 702; McCarter v. Lawton, 09-1508, p. 4 (La.App. 4 Cir. 7/21/10), 44 So.3d 342, 347. Given expert witnesses often disagree as to the appropriate standard of care, the weight given to the expert’s testimony is contingent upon the qualifications and experience of the expert and In any studies the expert relies on to render an opinion. Id. (citing Serigne v. Ivker, 00-0758,- p. 6 (La.App. 4 Cir. 1/23/02), 808 So.2d 783, 787-88). “Where medical experts express differing views, judgments and opinions, great deference is given to the fact finder’s determinations, which should not be reversed on appeal unless the reviewing court concludes that no reasonable factual basis exists for them.” Id., 09-1508, p. 5, 44 So.3d at 347 (citing Ruiz v. Guette, 07-0989, p. 5 (La.App. 4 Cir. 4/23/08), 983 So.2d 959, 962). Therefore, our review of conflicting medical expert testimony is subject to a manifest error/clearly wrong standard of review.-
Mr. Gaffney claims that Dr. Giles failed to properly monitor his PT/INR levels. Specifically, he avers that Dr. Giles breached the standard of care for Couma- *1108 din management when he failed to order serial testing of his PT/INR levels, two to three times a week, for several weeks according to the PDR guidelines. Additionally, Mr. Gaffney claims Dr. Giles’ failure to return his phone calls was a breach of the standard of care, which resulted in his Coumadin overdose and subsequent hospitalization.

COUMADIN MANAGEMENT

In this case, the parties dispute whether the PDR establishes the standard of care for physicians treating and managing patients taking Coumadin. The PDR is a compendium of the package inserts the pharmaceutical companies submit to the FDA. The PDR article on Coumadin states:
It cannot be emphasized too strongly that treatment of each patient is a highly individualized matter ... Dosage should be controlled by periodic determinations of prothrombin time (PT)/International Normalized Ratio (INR) or other suitable coagulation tests.
112The PDR also notes that it is “generally good practice” to monitor the patient’s response with additional testing in “the period immediately after discharge from the hospital and whenever other medications are initiated, discontinued or taken irregularly.” Further, the PDR warns that a patient should immediately contact the doctor “if signs and symptoms of bleeding arise like red or dark brown urine or red or tar black stool.”
At trial, both sides presented evidence relating to the proper standard of care for physicians treating and managing patients taking Coumadin. Mr. Gaffney’s expert Dr. Stark testified that the PDR article on Coumadin establishes the standard of care for physician’s prescribing or managing a patient’s Coumadin therapy. Based on his education, experience, and the literature on the drug’s administration, the standard of care in 2001 required physicians to serially test a patient’s PT/INR levels two to three times a week for several weeks or until the INR level stabilized within the desired range. LSU’s expert Dr. Kerut testified that the American Medical Association did not accept the PDR for establishing the standard of care for clinical practice. Rather, he testified that there were no written protocols or guidelines for Coumadin management in 2001. Thus, Dr. Kerut concluded that the standard of care was based on a physician’s experience and clinical judgment. Dr. Kerut testified that the American College of Cardiology and American Heart Association have determined that the PDR does not create binding guidelines for cardiologists.
Dr. Stark testified that he disagreed with the Medical Review Panel’s finding that waiting three weeks to check Mr. Gaffney’s INR was within the standard of care. The only level obtained when Mr. Gaffney appeared for his follow-up was 3.7 and four or five days after his discharge from UAB. He also testified that Mr. |1sGaffney was taking other drugs that could interfere with his Coumadin therapy. Consequently, he opined that three weeks was outside the standard ten-day course of treatment, where physicians typically observe a shift in a patient’s PT/INR levels. On cross-examination, Dr. Stark testified that his basis for the standard of care for Coumadin management included the PDR and a physician’s medical training and experience.
At trial, Dr. Giles testified that although the PDR is useful “it is not definitive,” noting that the package inserts are not a comprehensive guide of how a particular drug may be used. Dr. Giles also stated that based on his experience he did not believe 3.7 was so far outside the ideal range that more frequent testing was necessary in Mr. Gaffney’s case, nor did he *1109 believe that it was cause to change Mr. Gaffney’s dosage.
Dr. Kerut echoed Dr. Giles’ testimony, stating that in 2001 it was common to measure a patient’s PT/INR levels every three to four weeks. He further stated that the American Medical Association states that the PDR does not establish the standard of care for physicians. Dr. Kerut testified that physicians should follow the guidelines established by the American College of Cardiology and American Heart Association. Likewise, he noted that even those are only guidelines and that a physician should rely on his or her experience and training.
After hearing testimony and reviewing evidence provided by both parties, the trial court determined that the standard of care for prescribing and managing Coumadin was based on a physician’s medical judgment, experience, and clinical practice. The trial court concluded that “there has been no establishment of a breach of the standard of care mandated by Dr. Giles.” It reasoned that Dr. Giles had more than thirty years experience and had treated hundreds of patients ónj 14Coumadin. The trial court found that Dr. Giles had the requisite knowledge, training, and experience when Mr. Gaffney appeared for his follow-up visit. The trial court determined that “Dr. Giles[’] judgment was reasonable when he advised Mr. Gaffney to return to him with a new INR test in three weeks.” Likewise, the trial court found Dr. Giles’ actions consistent with Dr. Kerut’s opinion testimony and the medical review panel’s findings.
The PDR article on Coumadin states that it is “generally good practice” to monitor a patient’s response with additional testing in the period following discharge from the hospital. However, nothing in the PDR suggests that the PDR warnings and information on Coumadin provided by the drug manufacturer is intended to establish on its own the acceptable standard of medical care in this instance. Likewise, Mr. Gaffney’s own expert acknowledged that the standard of care for managing a patient’s Coumadin therapy included the physician’s experience and training.
In light of the deference given to a trial court’s factual findings on appellate review, we cannot say the trial court’s findings are clearly wrong. Accordingly, we find no error in the trial court’s 'determination that Dr. Giles did not breach the standard of care in the treatment and management of Mr. Gaffney’s Coumadin therapy.

MANAGEMENT OF PATIENT PHONE CALLS

On August 3, 2001, Mr. Gaffney experienced temporary vision loss in one eye while driving and then again when he arrived home in his driveway. He testified that he immediately called Dr. Giles’ office. At trial, Mr. Gaffney was asked if he knew whether the person who received his call was the answering service or a nurse in Dr. Giles’ office. Mr. Gaffney testified that it was his | ^“impression” that he was speaking with someone in Dr. Giles’ office because when the answering service takes patient calls “usually they say this is the answering service.” Mr. Gaffney testified that he described his symptoms to who he believed to be Dr. Giles’ nurse and asked that Dr. Giles call him back. The person receiving the call said that she would page Dr. Giles, and he would return Mr. Gaff-ney’s call.
Mr. Gaffney testified, however,, that he never received a call back from Dr. Giles or anyone at LSU. After Mr. Gaff-ney did not hear from Dr. Giles and concerned about the symptoms he was experi- ’ encing, he called Dr. Pacifico at UAB and left a message.
*1110 The next day, Mr. Gaffney noticed blood in his urine and immediately went home. Thereafter, he learned Dr. Pacifico returned his call from the night before, advising him to follow-up with Dr. Giles. Mr. Gaffney once again attempted to contact Dr. Giles.' When asked if he received an answer from Dr. Giles, Mr. Gaffney stated, “No. We ... either got the answering service and tried to get him to call again and we didn’t hear anything....”
Mr. Gaffney’s son Sean • also testified that they never received a return call from Dr. Giles or anyone at LSU, nor were any messages left for Mr. Gaffney on his answering machine. Mr. Gaffney testified that when he did not hear from Dr. Giles a second time, he called Dr. Pacifico, who promptly returned his call. Mr. Gaffney was instructed to obtain a PT/INR test; however, because the clinic was closed for the day, Dr. Pacifico instructed him to hold his doses of Coumadin until a test could be performed and to follow-up with Dr. Giles on Monday. Mr. Gaffney testified that when he observed blood in his stool that evening, he grew increasingly concerned that his “operation was coming undone.” He made another |1ficall to UAB, which was quickly returned, and was told to report to the emergency room. Mr. Gaffney thereafter reported to the emergency room at EJGH.
Experts for both sides testified that the standard of care in 2001 required a cardiologist treating patients on Coumadin “to have in place an answering service to receive calls, relay those calls to the cardiologist or cardiologist covering for him, and that the calls be promptly returned.”
On cross-examination, Dr. Giles was questioned about his office’s protocol for answering patient phone calls. He was asked, “[w]hat is [the] protocol in your office if a call comes in to one of your staff members or nurse, do you expect them to communicate it to you.” Dr. Giles responded in the affirmative and noted, “[i]f it’s during working hours and calls going to clinic I expect clinic people to do that, if it’s after hours or on the weekends I would expect the answering service, the call service.” Dr. Giles also acknowledged that in 2000 and 2001 there was a call service in place to receive patient phone calls. He stated that in the “Cardiology division, we have an on-call, always somebody to call.” When asked if he knew why Mr. Gaffney’s calls were not returned Dr. Giles stated, “I have no idea.” '
On direct examination, Dr. Giles testified that at his research office he also had a telephone line with an answering machine. He stated that generally the nurses triage any messages left; however, he “didn’t encourage patients to call that number because it was not set up for patient care ... but that didn’t keep them from doing it.” Even so, Dr. Giles conceded on cross-examination that he directed Mr. Gaffney “not to call [him] at the research office but to always call at the clinic.”
Mr. Gaffney testified at trial that he was “generally” aware that Dr. Giles was employed by LSU. He also testified that he was certain that when he began experiencing irregular symptoms on August 3rd he called Dr. Giles’ clinical office. 117He stated that he knew the telephone number because “... at one point [Dr. Giles] got mad at [him] and told [him] to quit calling his office.” He stated that when he began experiencing visual disturbances, he called “[t]he number they gave.” He was positive “it was the clinic office because the lady that answered was a nurse or ... an assistant nurse ... and she said he just left for the day, [and the answering] service wouldn’t know that.” Additionally, Mr. Gaffney testified that he did not call the general number for the health care network because as he stated, “she [the *1111 nurse] knew what I was talking about ... I remember distinctly the discussion.”
Mr. Gaffney further testified that in 2001 the telephone number he had in order to contact Dr. Giles routinely worked; yet, when he placed several calls the weekend of August 3rd and 4th he never received a return phone call. When Mr. Gaffney was asked if he ever received a response or a message left on his answering machine at home that weekend in reply to the phone calls he placed, Mr. Gaffney testified that he “never heard from D[r.] Giles again.”
Furthermore, testimony from Mr. Gaff-ney and his son Sean elicited at trial reflects a pattern of communication breakdowns and difficulty between Mr. Gaffney and Dr. Giles that began before Mr. Gaff-ney suffered from a Coumadin overdose. Sean testified that he witnessed his father’s growing frustration when Mr. Gaff-ney experienced difficulty obtaining a referral from Dr. Giles for surgery at UAB. Mr. Gaffney similarly testified that in October 2000 Dr. Giles told him that based on the results of the echocardiogram “the aneurysm had grown to where [surgery] was necessary.” Mr. Gaffney believed that Dr. Giles was going to refer him to Dr. Pacifico, so Mr. Gaffney routinely called UAB to follow-up on his referral status; however, he was told Dr. Giles had yet to refer him. Concerned that several months had passed since his echocardio-gram indicated the need for 11ssurgery, Mr. Gaffney testified that “finally [he] just ... said I’m referring myself.” At which point, Mr. Gaffney provided the necessary medical records and sent a letter to Dr. Pacifico requesting that he perform the required surgery.
In a letter sent in March 2009, Dr. Paci-fico agreed that Mr. Gaffney was a candidate for surgery and requested that he schedule a pre-operative exam with Dr. Giles. At trial, Mr. Gaffney expressed his difficulty in scheduling with Dr. Giles the required pre-operative exam. He testified that he did not want to “screw around,” so he called Dr. Pacifico and asked if he arrived a day before the scheduled operation would UAB perform the pre-operative exam.
The testimony at trial demonstrates a pattern of communication breakdowns between Mr. Gaffney and Dr. Giles. The communication breakdowns are evident in the record prior to Mr. Gaffney’s surgery at UAB and after when Mr. Gaffney began experiencing irregular post-operative symptoms and his attempts to reach Dr. Giles proved unsuccessful. Additionally, the trial court noted that Dr. Giles did not offer a defense for his and/or his office’s failure to follow the standard protocols for returning patient phone calls.
In this case, it is evident that the trial court’s factual findings relied largely on the totality of the testimony presented and the trial judge’s determinations regarding the credibility of witnesses. Therefore, on appellate review we must give great deference to the trial court’s factual conclusions. Based on the record before us, this Court cannot say the trial court lacked a reasonable basis for its factual findings. Accordingly, we find no manifest error in trial court’s judgment that the failure of Dr. Giles and/or his office to return Mr. Gaffney’s phone calls was a breach of the standard of care.
119Once the trier of fact has determined that a duty was owed and there was a breach of that duty, the trier of fact must determine if the breach was the cause in fact of the injury alleged. Lind-ner, 04-1019, p. 5, 894 So.2d at 431. A plaintiff asserting a medical malpractice claim need not show that the defendant’s conduct was the only cause of the harm. Austin v. St. Charles General Hosp., 587 So.2d 742, 748 (La.App. 4th Cir.9/26/91). He must only prove by a preponderance of *1112 the evidence that the defendant’s actions were a substantial cause of the injury. Id. at 746. Additionally, causation is a question of fact. Id. at 748. The test to determine if there is a causal connection between the defendant’s conduct and the plaintiffs injuries is whether the plaintiff has shown that it is more probable than not that plaintiffs complications could have been delayed or prevented, or that there was a chance that there could have been a better result. See Graham v. Willis-Knighton, 97-0188 (La.9/9/97), 699 So.2d 365; Levron v. State of La. Dept. of Health and Hosp., 92-2094 (La.App. 4 Cir. 4/24/96), 673 So.2d 279, 288.
At trial, Mr. Gaffney had to prove by a preponderance of the evidence that Dr. Giles’- substandard care caused Mr. Gaffney harm that he would not have otherwise suffered. Lindner, 04-1019, p. 5, 894 So.2d at 431. Here, Mr. Gaffney claims that had Dr. Giles returned his phone calls, the progressive deterioration of his condition and the alleged residual damages from which he suffers would not have otherwise occurred.
On appeal, the State claims that Mr. Gaffney failed to present evidence to show Dr. Giles’ breach of the standard of care was the cause-in-faet for damages Mr. Gaffney suffered. In addition, the State contends there is no testimony to establish that Mr. Gaffney suffered damages as a result of the delay in treatment |j>ncaused by the unreturned phone calls. Likewise, Mr. Gaffney contributed to the delay in his treatment by not reporting to the emergency room sooner.
As support, the State points to the trial court’s finding that although the physicians acknowledged the need to return Mr. Gaffney’s calls, not one testified that the delay in returning the phone call prior to Saturday, August 4th caused any of the residual problems which Mr. Gaffney contends he had or continues to experience. The State claims the trial court’s finding is indicative of the lack of sufficient evidence to prove Dr. Giles’ conduct was the substantial cause of Mr. Gaffney’s damages; thus, the trial court’s award of damages in Mr. Gaffney’s favor is clearly wrong. We disagree.
The trial court’s written reasons makes a distinction between the types of harm Mr. Gaffney alleges he suffered, specifically residual damages as a consequence of the drug overdose and a deterioration of his condition prior to his reporting to the emergency room.
The trial court found that the delay in medical treatment has no causal connection to the prolonged damages Mr. Gaffney alleges to suffer (including erectile dysfunction, vertigo, urinary incontinence, and a diminished active lifestyle). To this point, the trial court noted the lack of medical testimony to support Mr. Gaff-ney’s claim that the various medical conditions he currently suffers from are a result of the Coumadin overdose. The trial court also relied on testimony of Dr. Learned, who stated that Mr. Gaffney’s condition improved dramatically with an infusion of fresh frozen plasma. In light of Mr. Gaff-ney’s quick response to treatment and a lack of medical testimony to the contrary, the trial court concluded the alleged residual injuries Mr. Gaffney complains of are unrelated to his overdose. Based on the testimony presented at trial, the court 12idetermined there was no evidence to prove that the injuries Mr. Gaffney alleges to suffer from are a lingering consequence of the overdose; andj consequently, these ailments are unrelated. Therefore, there is no causal connection between the failure to return Mr. Gaffney’s phone calls and ailments the trial court deemed unrelated to the Coumadin overdose.
Additionally, the State’s suggest tion that Mr. Gaffney contributed to the *1113 delay in his treatment by not reporting to the emergency room sooner, the trial court seemingly dismissed. In this case, there was competing testimony at trial as to when Mr. Gaffney arrived at the emergency room. It does not appear the trial court attributed to it much weight as the court stated there was no evidence that Mr. Gaffney’s delay aggravated his condition. Nevertheless, Mr. Gaffney is not required to show that Dr. Giles’ failure to return his calls was the only cause of his harm. Austin, 587 So.2d at 748. Mr. Gaffney need only show that Dr. Giles’ conduct was a substantial cause in fact of his injury. Id Likewise, “[a] substantial factor need not be the only causative factor; it need only increase the risk of harm.” Hastings v. Baton Rouge General Hosp., 498 So.2d 713, 720 (La.11/24/86).
The trial court’s determination relied on the fact that Mr. Gaffney’s “condition progressively deteriorated” between the initial phone call made to Dr. Giles on Friday afternoon and Saturday evening when Mr. Gaffney reported to the emergency room. The trial court acknowledged that but for Mr. Gaffney taking action to call UAB when Dr. Giles and/or LSU failed to return his calls and UAB instructing him to report to the emergency room, the outcome in this case could have been different. Thus, the trial court found if Dr. Giles and/or LSU had returned Mr. Gaff-ney’s phone calls, it is likely that Mr. Gaffney’s condition would not have deteriorated so drastically between the time Mr. Gaffney began | ^experiencing irregular symptoms and UAB advising him to go to the emergency room.
Following Mr. Gaffney’s initial call to Dr. Giles when he began experiencing visual disturbances, he testified to observing blood in his urine and later blood in his stool. Believing Mr. Gaffney’s symptoms might be related to his Coumadin therapy, Dr. Pacifico advised Mr. Gaffney to halt his scheduled doses. At trial, all testifying physicians agreed that when Mr. Gaffney reported to EJGH his INR level of 11.8 was dangerously high and outside the stable range for a patient on Coumadin. Additionally, there was medical testimony that most individuals with an INR level that high do not survive, and that Mr. Gaffney was “very lucky.” Likewise, a CT scan of Mr. Gaffney’s head revealed a brain bleed. The record demonstrates sufficient evidence of Mr. Gaffney’s deteriorating condition.
Considering the deference given to the factual findings of the trial court on appellate review, we find no manifest error in the trial court’s ruling awarding Mr. Gaff-ney damages for his deteriorated condition caused by Dr. Giles’/LSU’s failure to return his phone calls.
In his answer to the State’s appeal, Mr. Gaffney asks this Court to amend the damages award by increasing the amount awarded to reflect the residual damages from which he has suffered and from which he continues to suffer. As previously discussed, the trial court found the residual damages Mr. Gaffney complains of are unrelated to his Coumadin overdose. Therefore, the trial court’s award reflects only the damages sustained during the delay in treatment which led to Mr. Gaffney’s condition progressively deteriorating. The trial court is afforded vast discretion in determining an award of damages, and as such, an appellate court will | j^not disturb an award absent an abuse of discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). We find no such abuse in this case. Therefore, Mr. Gaffney’s request for an increase of the amount of damages awarded is denied.
The trial court’s ruling is amended, however, to remove Dr. Giles’ name pursuant to Detillier. The Louisiana Su *1114 preme Court has previously held that “in the event that the state health care providers are found by the court to have committed medical malpractice, any judgment in favor of the successful claimants will be entered against the State of Louisiana alone.” Detillier, 03-3259, p. 16, 877 So.2d at 111. The Supreme Court explained that the legislative aim of the Malpractice Liability for State Services Act (“MLSSA”) is to ensure an adequate supply of healthcare professionals willing to provide medical care to patients on behalf of the state. Id., 03-3259, p. 15, 877 So.2d at 111. Consequently, the MLSSA’s purpose is frustrated if healthcare providers are held personally hable for medical malpractice. Id. Therefore, the trial court’s ruling in favor of Mr. Gaffney against Dr. Giles for failing to return his phone calls is amended to remove Dr. Giles’ name and is entered against the State alone.

DECREE

Based on the foregoing reasons, we find no manifest error in the trial court’s ruling finding no breach of the standard of care regarding the management of Mr. Gaff-ney’s Coumadin therapy and ruling in Mr. Gaffney’s favor as to Dr. Giles’ breach of the standard of care for failure to return Mr. Gaffney’s phone calls. Pursuant to Detillier, however, the trial court’s judgment is amended and entered against the State alone. Accordingly, the trial court’s ruling is affirmed as amended.
AFFIRMED AS AMENDED
BONIN, J., concurs and joins the reasons assigned by DYSART, J.
DYSART, J., concurs with reasons.

. 03-3259 (La.7/6/04), 877 So.2d 100.

. Medical experts testified at trial that patients on Coumadin require blood testing to detect clotting times. These blood tests aide physicians in determining and adjusting the proper dosage to maintain patients within a stable prothrombin time ("PT”) and International Normalized Ratio ("INR”) range on a given dosage of Coumadin.

. Dr. Giles' medical records for Mr. Gaffney incorrectly note the results of Mr. Gaffney's INR test as having occurred on July 17, 2001.

. Mr. Gaffney’s testimony was corroborated by his son, Sean Gaffney. At trial, Sean testified that the calls in question to Dr. Giles were made and that they never received a return call from Dr. Giles or anyone at LSU; however, they received return calls from Dr. Pacifico/UAB.